# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* M. J. WALKER, Minor.

UNPUBLISHED
June 28, 2016

No. 329965
Wayne Circuit Court
Family Division
LC No. 15-520102-NA

*In re* OSBORN/WALKER, Minors.

No. 329967
Wayne Circuit Court
Family Division
LC No. 15-519805-NA

Before: MURPHY, P.J., and SAAD and BORRELLO, JJ.

PER CURIAM.

In these consolidated appeals, respondent father (hereafter respondent) appeals as of right the trial court's orders terminating his parental rights to his three minor children, a girl born in 2010 (M.W.), a boy born in 2013 (J.O.), and a boy born in 2015 (T.W.). Respondent's parental rights were terminated pursuant to MCL 712A.19b(3)(a)(*ii*) (parent deserted child for more than 91 days),[1] (b)(*i*) (parent's act caused physical injury or abuse to child or sibling of child), (g) (failure to provide proper care or custody of child), (j) (reasonable likelihood of harm to child if returned to parent's home), (k)(*iii*) (parent abused child or sibling of child by battery, torture, or other severe physical act), and (k)(*v*) (parent abused child or sibling of child resulting in life-threatening injury). On appeal, respondent argues that the trial court clearly erred in finding that the Department of Health and Human Services (petitioner) presented clear and convincing evidence in support of the statutory grounds for termination and in finding that petitioner presented a preponderance of evidence showing that termination was in the children's best interests. The primary focus of the proceedings concerned whether injuries incurred by the youngest child, T.W., who was about three months old at the time, resulted from shaken baby

---

[1] Section 19b(3)(a)(*ii*) pertained solely to respondent's oldest child, M.W., and respondent fails to challenge that statutory ground on appeal.

-1-

syndrome (SBS), also referred to as abusive head trauma (AHT), as inflicted by respondent, or whether there was an innocent explanation for the child's injuries, such as a seizure. We affirm.

## I. BACKGROUND

Pursuant to two separate petitions, petitioner initiated child protective proceedings regarding the three children in 2015. The first petition, dated May 15, 2015, concerned respondent's two youngest children, J.O. and T.W., and the petition encompassed both respondent and the mother of J.O. and T.W., with whom respondent had been residing.[2] The petition requested the trial court to authorize the petition, to take jurisdiction over the children, and to terminate the parental rights of the three parents at issue, including respondent. As relevant here, it was alleged in the petition that respondent had not provided financial or material support for J.O. and T.W., that respondent had physically abused T.W. on May 6, 2015, resulting in significant internal head injuries and surgery to relieve intracranial pressure, that respondent engaged in domestic violence, beating the children's mother on a regular basis, and that respondent had a criminal history that included drunk driving, assault, stolen property, and disorderly person convictions.[3] The second petition, dated June 19, 2015, concerned M.W., and petitioner requested the trial court to authorize the petition, to take jurisdiction over M.W., and to terminate respondent's parental rights to the child. M.W. did not live with respondent. M.W.'s mother, who had legal and physical custody of M.W. following a relationship with respondent that had ended years earlier, was not named as a respondent in the petition. The allegations pertaining to respondent mimicked those alleged in the first petition.

A combined adjudicative trial and termination hearing commenced on August 6, 2015, with respect to both petitions. Initially, the mother of J.O. and T.W. (hereafter mother) entered a plea of admission to the allegations in the petition, which primarily regarded a failure to protect. Also, petitioner agreed to a temporary wardship as to mother, withdrawing the request to have her parental rights terminated. The trial and termination hearing was conducted over three days, with the first two days devoted to the submission of evidence on the adjudication question and the statutory grounds for termination and the third day devoted to the presentation of evidence on the children's best interests.

Respondent testified that he had known mother for three years and lived with her for five months. He conceded that he had perpetrated acts of domestic violence against mother and past

---

[2] The petition also covered a third child, a girl (not encompassed by this appeal), and that particular child's father, who is not respondent; the mother of this girl is also J.O. and T.W.'s mother, and the girl lived with her mother, respondent, J.O., and T.W.

[3] The petition indicated that respondent was currently on probation for a 2012 conviction. The lower court record contains the numerous judgments of sentence relative to respondent's criminal history.

female partners,[4] that he had a drinking problem and was an alcoholic, that he had a criminal record and history, and that he was unemployed. According to respondent, on May 6, 2015, he was caring for J.O. and T.W. while mother was out of the home; respondent indicated that he was tired at the time and aggravated because mother had left the house abruptly without saying anything. Respondent testified that when mother left the house, T.W. was sleeping, but he awoke crying about twenty minutes later after J.O. made too much noise playing. Respondent asserted that he picked T.W. up, changed his diaper, placed him on the couch next to a pillow so he would not fall, went and prepared a bottle to feed him, and then returned to the couch and began feeding T.W. Respondent testified that T.W. was crying and seemed agitated, which was not normal for T.W. Respondent then described what happened next:

> I don't know what it was. I named it a seizure because that's what it looked like to me. I don't know if it was a mild stroke, I don't know anything about medical terms with babies. All I know is, my son – I seen it before because it happened before. He locked up and tightened up and released, and then his eyes rolled in the back of his head and he relaxed his body, and it's like he fainted.

Respondent stated that he then shook T.W. a little bit in an attempt to revive him. Respondent acknowledged that in a written statement, he had indicated that he " 'bounced my baby to get him to come too.' " But respondent reiterated that he had actually shaken T.W, although not violently, so as to revive him.[5] Respondent, in further describing the events, indicated that T.W. "like went catatonic, made some funny noise, just making noises, then he just relaxed his body, relaxed and his eyes rolled in the back of his head, and he laid out like that." Respondent testified that he did not have a phone and that he flagged down a mailman who called 911. Respondent did not accompany T.W. in the ambulance and instead remained at the house as T.W. was brought to Oakwood Annapolis Hospital; he was later transferred to Children's Hospital of Michigan. Respondent explained that he did not accompany T.W. to the hospital because mother's daughter, who, as mentioned earlier, also lived at the house and was seven years old, was due home from school shortly and someone needed to let her in the house and care for her.[6] Indeed, respondent did not go to the hospital a few days later when surgery

---

[4] Respondent later attempted to claim that it was all verbal abuse, but then conceded that he had pled guilty to domestic assault on one occasion for putting his hands on the mother of his oldest child.

[5] Respondent's written statement was otherwise consistent with his trial testimony.

[6] Respondent testified that he generally stayed home and cared for the three children while mother was at work. Testimony reflected that mother had made other arrangements regarding her daughter for May 6, 2015, such that she was not going home directly after school; respondent claimed that he was unaware of those arrangements at the time. Respondent testified that he had contemplated going along with T.W. in the ambulance, bringing J.O. with him, and had actually entered the ambulance. But he then decided against it when ambulance personnel said it was unnecessary for him to accompany them and upon remembering of the perceived need to await mother's daughter's return home from school.

was performed on T.W., nor did he visit T.W. before the surgery. Respondent maintained that he had no transportation available to him to go and see T.W., where his family had all turned against him. He testified that he did visit T.W. the day after the surgery, having raised some money for the bus by panhandling.

As vaguely alluded to above, respondent claimed that T.W., who was born on February 14, 2015, had suffered a seizure-like episode in his presence in April 2015. Respondent described the occurrence in a manner that was comparable to the description he gave of the incident on May 6, 2015. According to respondent, in the April event, T.W. was unconscious for about five seconds before returning to a conscious state on his own; respondent did not call 911, but did call mother to inform her of what transpired.[7] Respondent testified that he did not shake T.W. as he later did in relation to the May incident. Respondent did not know whether T.W. had ever had a seizure while in mother's care, nor was he aware of any other seizure-like incidents beyond the two already mentioned. With respect to the purported seizure in April 2015, respondent stated that T.W. was not taken to a doctor until three days after it occurred, at which time mother took T.W. in for medical care, informing respondent thereafter that T.W. was fine according to what medical personnel had told her. Respondent contended that the "seizure" in April 2015 occurred about a week or two after T.W. had stomach surgery to address an inability to digest food.

When the assistant attorney general asked respondent how he thought T.W. became injured, respondent stated:

> I really don't want to think it was [mother]. I think she let somebody watch our child that was not trustworthy, did not know how to take care of a kid, and somebody did something to our kids. I don't want to think it was [mother].[8.]

Respondent conceded that he alone was watching and caring for T.W. when the April and May incidents occurred. Finally, respondent testified that T.W. had been acting normally on the evening of May 5, 2015.

Mother testified that an aunt picked up her daughter from school or from the bus stop and cared for her on the days that mother worked.[9] Mother had two jobs, but was off during the day as to both places of employment on May 6, 2015, and she acknowledged that respondent may not

---

[7] At this point in the testimony, respondent indicated that T.W. had also been unconscious for about five seconds in regard to the May 6th episode.

[8] Respondent provided some testimony about mother sleeping next to T.W. in the same bed on multiple occasions, which resulted in mother, at times, rolling on top of T.W., causing respondent to react and remove the child. Respondent essentially portrayed himself as being the parent who was much more concerned about T.W.'s well-being than mother. His testimony generally tended to imply that mother may have caused T.W.'s injuries.

[9] Again, mother's daughter lived in the home, but she was not respondent's child.

have known that she had made arrangements for that day in regard to her daughter being picked up after school. Mother was out running errands on May 6, 2015.[10] Respondent had indicated to mother that he did not want her to leave the house, as he preferred for her to stay home on her days off. Mother testified that T.W. had no history of seizures or convulsions, nor had there been any complications or problems with respect to his birth. At some point after she had left the house on May 6, 2015, leaving respondent alone with J.O. and T.W., mother noticed a missed call and voice message from respondent on her cell phone and she had a voice message from a number that she did not recognize. The latter message was from Oakwood Annapolis Hospital regarding T.W., and she then raced to the hospital, later accompanying T.W. when he was transferred to Children's Hospital. The voice message from respondent had also alerted mother that T.W. had been taken to the hospital.[11]

Regarding the supposed seizure incident in April 2015, mother testified that respondent had left phone messages, describing the situation consistent with his trial testimony. Contrary to respondent's testimony, mother claimed that she left work and immediately took T.W. to Henry Ford Hospital, where T.W. obtained care through the emergency department. Mother testified that T.W. was acting perfectly fine at that time. Respondent had not gone along with them to the hospital, but mother indicated that it might have been because he was on a probation tether at the time. Mother was questioned in regard to hospital documents concerning the visit, which took place on April 12, 2015, and she testified that medical personnel did not diagnose or notice any seizure-like activity. Mother also explained that T.W. had surgery when he was two or three weeks old for pyloric stenosis (stomach surgery mentioned by respondent), which we shall touch on again later in this opinion, and that he was hospitalized for approximately one week in connection with the surgery.

Mother testified that respondent was not present for T.W.'s subsequent surgery following the events of May 6, 2015. Mother acknowledged that she refused to drive him to the hospital in her car because they were not getting along. She feared that he had injured T.W. According to mother, respondent visited T.W. the day after his surgery, but respondent was intoxicated. Mother testified that respondent told her that he had shaken T.W. in an effort to revive him after he went limp. Mother stated that respondent had physically abused her on a regular basis and had given her a black eye on more than one occasion. The abuse had occurred at times in front of the children. Respondent had threatened to kill her and her family if mother ever left him. Mother, who was not married to respondent, testified that her relationship with respondent had ended and that he was no longer residing in her house. She indicated that her lease and a PPO

---

[10] Mother testified that she had run errands from about 9:00 a.m. until around noon, taking J.O. with her. When she returned home, she dropped off J.O. and left to continue with her errands. It was after she dropped off J.O. at the house when the incident with T.W. occurred. Respondent's testimony was essentially consistent with this sequence of events.

[11] It is not clear what phone respondent used to make this call, given that he had testified to not having a phone when the incident occurred with T.W., which is why he had to flag down the mailman.

barred him from being at the house. Mother testified that she had done nothing to harm T.W. She did not know what actually occurred on May 6th in connection with T.W., as she was not present, but she thought that "maybe . . . he shook him too hard to revive him." Mother asserted that, aside from her, only respondent and respondent's mother had ever watched, cared for, or babysat T.W. With respect to the early morning of May 6, 2015, mother had fed T.W. and she had not noticed any problems or abnormal behavior with T.W.

Mother did testify that respondent was a "fairly good father" and that she generally felt safe with him taking care of the children. Mother stated that she thought that T.W.'s head had appeared "a little big" since birth, although "[n]ot abnormally large," and she had spoken to doctors about the matter during checkups, but they had indicated that all was fine. Mother testified that she had never placed T.W. in her bed for the two to sleep and that "[i]f there was any time the baby was put in my bed, [respondent] placed the baby in my bed while I was sleeping." And she was not aware of ever having rolled on top of T.W.

A child protective services (CPS) specialist testified that he spoke to respondent by phone on May 8, 2015, and that respondent described the incident with T.W. that had occurred two days earlier. Respondent's description of the event to the CPS specialist was consistent with respondent's trial testimony. Mother had informed the CPS specialist that respondent beat her often during the three years they were together. The CPS specialist testified that T.W. was currently placed with his paternal grandmother and that J.O. had been placed with his maternal grandmother.

One of respondent's cousins, who is a nurse, testified that T.W. and mother were at her house on the evening of May 5, 2015, and that she mentioned to mother that T.W.'s head looked big, that it appeared larger than it had when she previously saw T.W., and that T.W.'s head size did not appear normal. According to the cousin, mother disregarded her concerns. Respondent's cousin testified that she had driven respondent to the hospital to visit T.W. following T.W.'s surgery after respondent had caught a bus and could get no further than around her home. The cousin was at respondent and mother's home on the evening of May 6, 2015, when mother returned from the hospital. Respondent was upset that mother had not attempted to contact him about T.W.'s condition and he broke down crying after mother explained the nature of T.W.'s injuries. Respondent's cousin noted that mother was angry with respondent. The cousin had never witnessed any domestic violence between respondent and mother.

Respondent's mother, who was now caring for T.W. and claimed that she was estranged from respondent because of his behavior and drinking, testified that T.W. had recently passed tests conducted as part of well-baby visits to the doctor. T.W. had not suffered any seizures while in her care. Respondent's mother had never witnessed acts of domestic violence between respondent and mother, although she testified to once seeing mother when mother did have a black eye.

Doctor Marylu Angelilli testified on behalf of petitioner. Dr. Angelilli is Chief of Staff at Children's Hospital of Michigan, a child abuse pediatrician, and a general pediatrician. She was recognized by the trial court, without objection, as an expert in the areas of child abuse and general pediatrics. Dr. Angelilli reviewed medical records, charts, reports, tests, and lab results

pertaining to T.W., and she personally examined T.W. Dr. Angelilli was consulted and became involved in the case on May 12, 2015, six days after T.W. had been admitted. Dr. Angelilli testified that an EKG (electrocardiogram) showed that T.W.'s heart was normal, that an EEG (electroencephalogram) was normal and did not reveal any evidence of a seizure, that a CT (computed tomography) scan depicted "fluid around the brain over the top and the sides, a large amount of fluid," and that the CT scan showed "what looked like some blood in the back of the brain that was suspicious for subdural hemorrhage."[12] Dr. Angelilli explained that the fluid and suspected blood was later determined all to be blood and that this led to a suspicion of child abuse:

> They called it fluid, they were suspicious for blood, and in the small hemorrhages in the back of the brain, they were sure it was blood. The very large hemorrhages around the surface of the brain they just called it fluid, but it was suspicious for blood so then they did the MRI [magnetic resonance imaging] which confirmed that – it was later confirmed in other ways. So when there's blood in that particular outside lining of the brain, in that particular space, then there's a suspicion for abuse. . . . [O]ne of the main causes for blood in that location is trauma, and in the absence of any history to trauma, history meaning that nobody came in and said that the baby had been in a car accident or fell out of the window, anything that was remotely related to trauma. We weren't told of any trauma, so that becomes suspicious when there's no explanation for having blood around your brain.[13]

Dr. Angelilli further testified to observing "clotted off veins" in T.W.'s MRI. According to Dr. Angelilli, this reflected "that the veins ruptured and they were bleeding, and then they developed a blood clot which the body naturally does to stop the bleeding." She next testified that the MRI revealed a diffusion restriction, which she described as follows:

> [T]hat's an indication of shearing forces causing a lack of oxygen to that specific part of the brain, and the particular place where that occurred was in the middle of the brain, and so that's from trauma that's caused a disconnect between layers of cells in the brain. So when you have in the brain, white matter and gray matter[,] . . . they're loosely connected but tightly connected with each other, so they're tight because the connection between the two is loose, and if there's a shearing injury, which is a strong rapid movement with a sudden stop, those two type[s] of cells, two chunks of cells, will just sort of separate a little bit. They ran across each other a little bit and that causes cell death because they move, then the

---

[12] Dr. Angelilli indicated that T.W. did not have any bone or skull fractures.

[13] Dr. Angelilli subsequently testified that the areas of blood on the top and the side of T.W.'s brain "were extremely large." She indicated that neurosurgeons performed surgery on the second or third day in order to drain the blood, as the sheer amount of blood was pressing on the child's brain, endangering his life.

connection with moving oxygen from one group to the other is disconnected and you get a lack of oxygen in that one area. So it didn't happen all over the brain, but it happened in this one area we know was typically susceptible to an acceleration/deceleration injury, rapid movement, or shaking, or like a whiplash type injury.

When asked what amount of shaking would be required to cause that particular type of injury, Dr. Angelilli stated that "[t]he shaking would have to be hard enough that if you saw it, you would know it was dangerous. There's not a measure." She testified that it would entail more than the normal handling of a baby. Dr. Angelilli explained that a shearing injury brought on by rapid acceleration/deceleration forces is what leads to vein bleeding and eventual clotting.

Dr. Angelilli next described that T.W. had extensive bleeding in the retinas of his eyes. She testified that the same rapid acceleration/deceleration movements discussed above could cause retinal bleeds and that such types of hemorrhages are "highly specific for child abuse from a shaking mechanism without an impact." Dr. Angelilli discussed an ophthalmologist report that was part of the record, noting that the ophthalmologist had opined that the retinal hemorrhages were consistent with non-accidental trauma. Dr. Angelilli next observed that T.W. did not have any coagulation disorder, such as hemophilia, and that "all the tests were normal so we had no[] evidence that the baby was prone to bleeding." She also testified that the bleeding around the brain and in the retinas could not be attributed to T.W.'s birth, the birthing process, or any type of birth trauma,[14] nor would a seizure have produced the bleeding.

Dr. Angelilli proceeded to address the timing of the injuries. She opined that the small hemorrhages at the base of the skull had "occurred within a couple days[,]" and "the large bleeds around the top and sides of the brain could have happened recently or it could have happened a while back, or there could have been more than one episode[;] [i]t's impossible to tell when." Dr. Angelilli's diagnosis was non-accidental, intentionally-inflicted AHT or SBS. She asserted that it was intentionally inflicted because T.W. could not have done it on his own, and because the injury required rapid acceleration and deleration. She opined that there was no innocent medical explanation for T.W.'s injuries. Dr. Angelilli indicated that T.W.'s eyes rolling back in his head and him stiffening and then going limp were "very typical" of AHT/SBS. She stated that shaking a baby just once could potentially cause AHT/SBS. Dr. Angelilli testified that T.W. did not have any external injuries or bruises, but such injuries would not be expected unless there had been some type of physical impact. She concluded that this was a case of child abuse.[15]

On cross-examination, Dr. Angelilli indicated that a person can have a seizure and still have a normal EEG if the seizure resolved itself; therefore, an "EEG isn't perfect at telling if you ever had a seizure." She acknowledged that T.W. had been discharged from the hospital with

---

[14] Dr. Angelilli noted that T.W.'s birth involved a normal, vaginal delivery at 39 weeks.

[15] Dr. Angelilli testified that it was too early to tell if T.W. suffered any permanent brain damage, which determination would have to wait until he gets older and testing can be undertaken.

anti-convulsive medication and that, because the EEG was not definitive and because of the symptoms described by respondent, "there could have been [a seizure.]" Dr. Angelilli testified, however, that a seizure does not cause bleeding around the brain, but that such bleeding could cause a seizure. She agreed that slow bleeds can happen at birth; however, the vast majority of them are resolved within four weeks and are typically small. Dr. Angelilli testified that in mid-March 2015, when T.W. was being treated at Children's Hospital for pyloric stenosis, there was nothing in the medical records suggesting that he had any bleeding issues, only that he was generally a healthy baby but with pyloric stenosis.[16] With respect to whether T.W. had any existing bleeding problems, Dr. Angelilli listed the three coagulation tests that were performed showing no bleeding disorders and then acknowledged that five other available tests on the matter were not performed.[17] In regard to the size of T.W.'s head, Dr. Angelilli noted that it was normal size at the time of his earlier surgery in March 2015, but that it became large following the May 6th incident, most likely due to the "very large brain bleed."

Respondent presented the testimony of Dr. Werner Spitz, who was recognized as an expert in forensic pathology. Dr. Spitz reviewed medical records and documents from Children's Hospital pertaining to T.W. Dr. Spitz opined that when T.W. was admitted on May 6, 2015, he did not have a subdural hematoma; rather, "it was a hygroma],]" which is "a late development of a subdural hematoma" that occurred at least two months earlier.[18] Dr. Spitz asserted, "Everything that was determined in May occurred, actually occurred two months earlier, at least two months earlier." He then stated that "[t]here's only one injury here, that injury occurred some time in late February or March [2015]." Dr. Spitz opined that "[i]f you tell me that the child exhibited a seizure in May, the cause of that seizure developed in February or March."

Dr. Spitz testified that an EEG would not necessarily show that a seizure had occurred, whether performed six hours or two days after the seizure. He indicated that the symptoms described by respondent sounded like a seizure and that a hygroma, which is a manifestation of an injury and causes intracranial pressure, can cause a seizure. Dr. Spitz testified that a seizure can cause strenuous movements and thus a seizure can cause a preexisting hygroma to bleed or grow larger. He observed that at one time the medical community was of the view that the manifestations displayed by T.W. and described by Dr. Angelilli always meant that a baby had been shaken, but that view had changed, although each of those signs, including the hemorrhages

---

[16] The doctor observed that pyloric stenosis is "an obstruction at the stomach at the part that empties out into the small intestines, and there is a muscle that enlarges and presses on the outlet of the stomach and that has to be released so the baby doesn't keep vomiting, having digestive problems."

[17] She later explained that it was thought unnecessary "to go beyond the normal screening tests."

[18] Dr. Spitz later indicated that "[a] hygroma is a subdural hemorrhage at an earlier stage." Stated otherwise, he noted that an older subdural hemorrhage is a hygroma.

and shearing injury, could still mean that a baby had been shaken. Dr. Spitz opined that "the conclusion remains in question about whether this was indeed a shaken baby [case]."

On cross-examination, Dr. Spitz acknowledged that he had not reviewed the actual MRI, EEG, CT scan, or EKG, although he had reviewed the reports interpreting those tests. He did not examine T.W. The following colloquy with Dr. Spitz took place regarding whether a seizure had occurred:

> *A*. Well, I come to the determination that there was a seizure because it was diagnosed in the medical records, and there was a subdural, and there was an increased pressure in the skull, all manifestations that were from the seizure.

> *Q*. I didn't see a seizure in the medical records. You did?

> *A*. I thought I did. I wouldn't be surprised if there was a seizure because everything I heard or read suggests that there will be. Or if there is a seizure, there are grounds for it, a basis for it.

> *Q*. Is it true that shaking a baby could cause the baby to have a seizure?

> *A*. Under certain circumstances, yes.

Dr. Spitz noted that a seizure can cause shearing forces. He agreed that shaking a baby can cause irregular breathing, can make a baby go limp, can make a baby's eyes roll back, and can cause shearing forces. When given respondent's description of how he had purportedly shaken T.W. to revise him and asked whether it could have caused shearing, Dr. Spitz responded, "probably not." Dr. Spitz indicated that T.W.'s injuries more likely resulted from some type of physical trauma, as opposed to a genetic abnormality.

All of the testimony and evidence discussed above was presented in the first two days of the trial, and the trial court proceeded to rule on the issue of adjudication and the statutory grounds for termination. The trial court determined that a preponderance of the evidence supported the court's exercise of jurisdiction over the children under MCL 712A.2(b)(1) and (2), given the evidence of abandonment relative to M.W., domestic violence perpetrated by respondent, including occurrences in front of the children, respondent's criminal record, and the "physical abuse to [T.W.]" The trial court next ruled that termination of respondent's parental rights was proper under MCL 712A.19b(3)(a)(*ii*) (M.W. only), (b)(*i*), (g), (j), (k)(*iii*), and (k)(*v*). The trial court found that T.W. had suffered a severe, non-accidental, and intentionally-inflicted head injury due to a violent shaking. The court observed, "That's the conclusion of the expert, Dr. Angelilli, and that's the conclusion of the [c]ourt." The trial court next found that the injuries had occurred while in respondent's care and that respondent had no plausible explanation for T.W.'s injuries. The court indicated that respondent had admitted to shaking T.W., but not excessively; however, the court expressed that it did not believe respondent in regard to the nature and extent of the shaking. The trial court stated that it reached this credibility determination based partially on respondent's history of domestic violence, his criminal record, which included assault, and his extensive drinking. The trial court ruled that

there was "clear and convincing evidence that [respondent] is responsible for [T.W.'s] injuries." The court noted that it had taken into account Dr. Spitz's testimony, including his opinion that the injuries were at least two months old; however, the court concluded that termination was still proper, explaining:

> [Dr. Spitz's testimony] opens up possibilities as to the time and cause of the child's injuries, but I believe the expert, Dr. Angelilli's testimony that the injuries were very recent and that's another reason why I find that father is responsible for those injuries.

The trial court then scheduled a hearing date to address the children's best interests.

At the best-interests hearing, respondent was the only party to present witnesses – his clinical therapist at a substance abuse treatment center and the mother of M.W. Their testimony was brief, and we shall discuss it in our analysis to the extent that it is relevant in addressing respondent's best-interests argument. At the end of the hearing, the trial court found by a preponderance of the evidence that termination of respondent's parental rights was in the best interests of the children. The court noted that M.W. was currently in the care of her mother and that T.W. and J.O. were currently in the care of relatives – the grandmothers. The trial court stated that it was basing its ruling on the physical abuse inflicted by respondent upon T.W., which resulted in a severe and life-threatening head injury. The court additionally indicated that its best-interests ruling was predicated on respondent's lack of insight and remorse, his attempts to blame others for his conduct, his poor judgment, his long history of domestic violence, his abuse of alcohol, his poor life choices, his history of unemployment, his poor parenting skills, and respondent's abandonment of M.W., all of which placed the children at a severe risk of harm. The trial court determined that it was highly unlikely that respondent would be able to provide a safe, stable, and secure home in the foreseeable future and that neglect would likely occur if the children were returned to his care.

Respondent appeals as of right.

## II. ANALYSIS

## A. EVIDENTIARY BURDEN AND STANDARD OF REVIEW

If a trial court finds that a single statutory ground for termination has been established by clear and convincing evidence and that it has been proved by a preponderance of the evidence that termination of parental rights is in the best interests of a child, the court is mandated to terminate a respondent's parental rights to that child. MCL 712A.19b(3) and (5); *In re Moss,* 301 Mich App 76, 90; 836 NW2d 182 (2013); *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). "This Court reviews for clear error the trial court's ruling that a statutory ground for termination has been established and its ruling that termination is in the children's best interests." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011); see also MCR 3.977(K). "A finding is clearly erroneous if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). In applying the clear error standard in parental termination cases, "regard is

to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).


## B. STATUTORY GROUNDS FOR TERMINATION

Respondent first argues that the trial court clearly erred in finding that clear and convincing evidence had been presented with respect to the statutory grounds for termination.[19]

---

[19] The trial court terminated respondent's parental rights pursuant to the following grounds set forth in MCL 712A.19b(3):

(a) The child has been deserted under either of the following circumstances:

\* \* \*

(*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.

(b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

(*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

\* \* \*

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

\* \* \*

(k) The parent abused the child or a sibling of the child and the abuse included 1 or more of the following:

\* \* \*

(*iii*) Battering, torture, or other severe physical abuse.

\* \* \*

(*v*) Life-threatening injury.

The gist of respondent's appellate argument calls into question the soundness of the conclusion that respondent caused T.W.'s injuries by violently shaking him, given the possibility, in light of Dr. Spitz's testimony, the April 2015 episode, the testimony about T.W.'s head size, and the surrounding circumstances, that other causative agents may have been involved, such as a seizure. Respondent applies that theory in attacking each one of the statutory grounds for termination.

This difficult case ultimately turned on the trial court's assessment of the credibility of the witnesses, most importantly Dr. Angelilli, Dr. Spitz, and respondent himself. Giving the trial court the required deference in regard to credibility determinations, *In re Miller*, 433 Mich at 337, and considering the evidence presented below, we are not left with a definite and firm conviction that the trial court made a mistake, i.e., that it clearly erred, in finding that the statutory grounds for termination were proven by clear and convincing evidence.

With respect to respondent's personal history, there was no evidence that he had ever physically abused his children in the past, but there was evidence that he was prone to violence in regard to his treatment of domestic partners, including incidents in front of the children, that he minimized or lied about the domestic violence, that he had a fairly extensive criminal background, and that he had a serious alcohol problem. Of course, this character-related evidence could not be used to substantively support a conclusion that respondent physically abused T.W. on May 6, 2015. However, as mentioned by the trial court, such evidence could reasonably be viewed as having a bearing on and calling into question respondent's credibility.

With respect to the circumstances surrounding the incident that transpired on May 6, 2015, there was evidence that respondent alone was caring for T.W. when T.W. came to require urgent medical care, that earlier that morning and the night before T.W. had been acting normally, that T.W. was crying directly beforehand, and that, by respondent's own acknowledgment, respondent was sleepy and aggravated when mother had left the house. Further, respondent conceded that he did indeed shake T.W., although respondent claimed that it was done mildly and in reaction to T.W.'s symptoms, not as a precursor to those symptoms. These circumstances, in and of themselves, did not establish that respondent had physically abused T.W., but they lent support for that conclusion, and they certainly did not eliminate the possibility that respondent had abused T.W.[20]

With the surrounding circumstances setting the stage for the possibility that respondent had physically abused T.W., petitioner's case ultimately and effectively rested on the expert testimony of Dr. Angelilli, who had impressive credentials relative to the subject of diagnosing child abuse. Her review of the medical records and tests was exhaustive, and she personally

[20] Much was made below of the fact that respondent did not accompany T.W. in the ambulance, nor visit him in the hospital early on or at the time of the surgery. However, the reasons given by respondent for his failures to so act were plausible and generally supported by other testimony. Indeed, the trial court did not mention these matters in its ruling, and we do not give them any weight in our analysis. We note that respondent was not criminally prosecuted for abusing T.W.

examined T.W. According to Dr. Angelilli, the extent and location of the bleeding around the brain, the retinal hemorrhages, the clotted-off veins, the diffusion restriction and shearing injury, the lack of an existing bleeding or coagulation disorder, the physiologically uneventful birth of T.W. and the inability to medically connect the injuries to the birthing process, the lack of evidence regarding a direct physical impact, T.W.'s otherwise generally healthy history, and the symptoms described by respondent all pointed to SBS/AHT. And, considering that it was respondent who was caring for T.W. at the time of the incident on May 6, 2015, that Dr. Angelilli timed the subdural hematoma in the back of the head as having occurred very recently, and that the surrounding circumstances generally lent support for petitioner's position, the evidence supported a determination that respondent had caused T.W.'s SBS/AHT. Minimally, there was no clear error.

Respondent's theory suggested the possibility of a seizure as the cause of T.W.'s injuries. And while she could not definitively rule out a seizure, Dr. Angelilli testified that the EEG did not reveal any evidence of a seizure and that a seizure could not have caused the bleeding injuries incurred by T.W. There had been no medical diagnosis by T.W.'s doctors of him ever having a seizure. Mother and T.W.'s paternal grandmother never observed T.W. displaying seizure-like symptoms. We note that although T.W. was prescribed anti-convulsive medication on being discharged from the hospital, his grandmother testified that T.W.'s doctors had discontinued the medication.

With respect to Dr. Spitz's testimony and his opinions, we first note that, to the extent that they conflicted with Dr. Angelilli's testimony, the trial court was free to find Dr. Angelilli the more credible expert witness on those matters. Also, although Dr. Spitz's expertise as a forensic pathologist is unquestionable, Dr. Angelilli's area of expertise was more relevant to this particular case, and she appears to have reviewed more of the medical documentation relative to T.W. than Dr. Spitz, along with personally examining T.W. One of the main contentions by Dr. Spitz, of which he was adamant, was that the injuries seen on May 6, 2015, were at least two months old. And respondent emphasizes this view in conjunction with the testimony about T.W.'s head appearing unusually large prior to May 6, 2015, suggesting that a preexisting brain injury unrelated to respondent's conduct was ultimately the cause of T.W.'s injuries observed by medical personnel on May 6th.

Dr. Angelilli's testimony concerning the bleeding on the top and sides of T.W.'s brain accepted the possibility that those particular areas of bleeding "could have happened a while back." That said, Dr. Angelilli additionally testified that when T.W. was hospitalized in mid-March 2015, about two months prior to May 6, 2015, to address his pyloric stenosis, the medical records did not indicate any bleeding issues, nor did they reflect that T.W.'s head size was abnormal.[21] Furthermore, Dr. Angelilli was quite clear that the small hemorrhages at the base

---

[21] Also, mother had checked with doctors regarding T.W.'s head size, and there was no indication of any problems. Dr. Angelilli had noted that T.W.'s head was large after the incident on May 6th due to the "very large brain bleed."

and back of T.W.'s brain were new; Dr. Spitz's testimony was never developed to such a degree as to clearly differentiate between the various locations of the brain hemorrhages.

Again, Dr. Spitz's testimony suggested an earlier cause of T.W.'s injuries, but the only event that occurred prior to May 6, 2015, that conceivably may have been linked to the injuries, at least as reflected in the record, was the April 12, 2015 seizure-like incident described by respondent.[22]  But, as with the May 6th incident, respondent alone was caring for T.W. at the time, raising a suspicion of abuse on that occasion.  Again, Dr. Angelilli opined that a seizure would not have caused the brain and retinal hemorrhages, and there was no medical evidence of T.W. having had a seizure.  On the subject of seizures, Dr. Spitz's testimony revealed some apparent confusion regarding whether a seizure had ever been diagnosed and indicated in T.W.'s medical records; there was no such diagnosis or indication.  Moreover, Dr. Spitz conceded that the symptoms displayed by T.W. on May 6, 2015, as described by respondent, and the nature of the child's injuries, including the shearing injury, could have been caused by someone shaking T.W. beyond the force purportedly employed by respondent.

In sum, the trial court did not clearly err in finding that respondent had physically abused T.W.  Given that respondent's appellate arguments are focused on that question in relation to all of the statutory grounds cited in support of termination, we affirm the trial court's findings that the statutory grounds were proven by clear and convincing evidence, including under MCL 712A.19b(3)(a)(*ii*), which, as noted at the outset, solely concerned the abandonment of M.W., and which ruling has not been challenged on appeal.

## C.  CHILDREN'S BEST INTERESTS

With respect to the trial court's best-interests determination, we place our focus on the child rather than the parent.  *In re Moss*, 301 Mich App at 87.  The trial court may consider such factors as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App  35, 41-42; 823 NW2d 144 (2012) (citations omitted). Moreover, a trial court must "explicitly address whether termination is appropriate in light of the children's placement with relatives."  *Id*. at 43 (quotation marks and citations omitted).

Respondent continues his attack on the trial court's finding that T.W. was physically abused, along with maintaining that respondent has a strong bond with the children, that he is a good father, and that he was making efforts through counseling to improve himself.  With respect to the trial court's best-interests determination, aside from the issue of the physical abuse of T.W., the court relied on, in part, respondent's history of domestic violence, his alcoholism, his lack of employment, and his abandonment of M.W.  Respondent presents no argument on appeal challenging these reasons given by the trial court and, of course, the issue of physical abuse pertaining to T.W. has now been resolved in petitioner's favor.

---

[22] There was no evidence suggesting a link between T.W.'s injuries and his surgery for the pyloric stenosis, nor was there evidence showing a causal connection tied to T.W.'s birth.

At the best-interests hearing, respondent's therapist indicated that respondent was motivated to turn his life around and that he was making progress dealing with his alcoholism, depression, and anxiety. However, the therapist also testified that parenting was not the focus of the counseling, which was primarily aimed at treating alcohol and substance abuse and all of life's issues bearing on that abuse. Moreover, respondent had only been in treatment for a little over 30 days and, while the trial court had determined nearly a month earlier that respondent had physically abused T.W., respondent had not informed the therapist of that fact, nor had he ever told the therapist about the nature of T.W.'s injuries. M.W.'s mother testified that respondent was generally a good father to M.W. when they had all lived together; she never feared that he would harm M.W. On cross-examination, however, M.W.'s mother stated that respondent's alcohol abuse had been a problem, and she conceded that respondent had physically abused her during their relationship.

For the reasons given by the trial court in support of its best-interests ruling, we hold that the court did not clearly err in finding that termination of respondent's parental rights was in the children's best interests.

Affirmed.


/s/ William B. Murphy
/s/ Henry William Saad
/s/ Stephen L. Borrello

-16-