433 Mich. 331 (1989)
445 N.W.2d 161
In re MILLER
DEPARTMENT OF SOCIAL SERVICES
v.
MILLER
Docket No. 82919, (Calendar No. 8).
Supreme Court of Michigan.
Argued January 5, 1989.
Decided August 30, 1989.
Frank J. Kelley, Attorney General, Louis J. Caruso, Solicitor General, Donald E. Martin, Prosecuting Attorney, and Robert B. Ebersole, Chief Appellate Attorney, for the petitioner.
William T. King for the respondent.
GRIFFIN, J.
After the probate court terminated the parental rights of respondent Glen Miller with respect to his son, Ryan Miller, now six years old, its order was reversed by a divided panel of the Court of Appeals.[1] We are required to decide whether there was sufficient evidence under the appropriate standard of review to support the order of the probate court. Contrary to the holding of the Court of Appeals, we conclude that the *333 probate judge's decision was not clearly erroneous, and therefore we reverse in part.[2]
I
With supplementation provided in the course of our opinion, we adopt the following summary of the facts and procedural history as set forth by the Court of Appeals:
The minor child, Ryan, was born in August, 1982. At that time, his parents were unmarried and Ryan lived with his mother, Sherry [then sixteen years of age].
In August, 1983, a neglect petition was filed against Sherry on the basis of information reported by Sherry's mother. Ryan's first three months of foster care were with Sherry's mother. The rest of his foster care was with his paternal grandparents.
In June, 1984, respondent and Sherry married. The marriage was tumultuous, and, at the time of the instant permanent termination proceedings, respondent had filed for divorce. [The divorce became final November 2, 1987.]
The probate court based its decision to terminate parental rights on MCL 712A.19a(f); MSA 27.3178(598.19a)(f),[[3]] which provides:
"Where a child remains in foster care in the temporary custody of the court following the initial hearing provided by section 19, the court may make a final determination and order placing the *334 child in the permanent custody of the court, if it finds any of the following:
* * *
"(f) The child has been in foster care in the temporary custody of the court on the basis of a neglect petition for a period of at least 2 years and upon rehearing the parents fail to establish a reasonable probability that they will be able to reestablish a proper home for the child within the following 12 months."
Respondent's claim of error is that the evidence did not clearly and convincingly establish that termination of his parental rights was warranted.
* * *
Respondent proposed a plan whereby he hoped to establish a proper home for Ryan, who the [probate] court found had never lived with him other than for brief visits. The plan was that respondent would change work shifts so that he could be home with Ryan during the evenings. He intended to play and watch television with Ryan and also do housework during those times. Although the trial court found that it was speculative as to who would be raising Ryan, respondent indicated that he would ask a neighbor to care for Ryan during the day while he worked. In the fall of 1987, Ryan was to begin school, and respondent would be able to be with him when the school day ended. The court found that respondent had a two-bedroom apartment and a steady full-time job with a good work record, had consistently paid for Ryan's support, had demonstrated good compliance with court orders, had paid for and attended therapy sessions, and had attended parenting classes and an alcohol education program. Nonetheless, the court found that "there is not evidence that he [respondent] could provide adequately emotionally for Ryan" and that there was no reasonable probability that respondent could provide a proper home for Ryan within the next twelve months. [In re Miller, supra, pp 76-79. Citations omitted.]
*335 II
A majority of the Court of Appeals was left with a definite and firm conviction that a mistake had been made. In re Miller, 167 Mich App 75, 81; 422 NW2d 1 (1988). In the view of the panel majority, the probate judge had placed undue emphasis on two specific occurrences in the history of Ryan's visitations with respondent and his former wife. Id., pp 79-80.
The first incident occurred in August, 1984, during a weekend visitation just prior to Ryan's second birthday. Sherry Miller telephoned the case worker to report that her husband had punished Ryan for a toilet-training lapse by picking him up by his hair and smearing feces on his face.
The second incident occurred one year later. In August, 1985, the case worker arranged an overnight visitation, the first since the toilet-training episode. On the day of the visit, the case worker received a call from the prosecutor's office advising that criminal charges had been brought against respondent. The charges were based on allegations that respondent had illegally entered a home where Sherry Miller was staying and assaulted her.[4] On the basis of this report, the case worker ended the visitation early and told Ryan's parents there would be no more visits "for a while." Thereafter, neither parent sought a resumption of visitation privileges until the following April; consequently, a period of over nine months elapsed during which Ryan did not see either of his parents.
*336 The reasoning of the appeals panel majority in reversing the probate court's decision is summarized in the following passage:
We agree with the probate court that this is a sad case and that Ryan needs stability in his life. But the evidence shows that most of the instability and discord was brought about because of the poor relationship that existed between Ryan's parents, which was aggravated by a number of factors, including the fact that Sherry regularly left home for up to six weeks at a time. Munro-Sneider [the case worker] even testified that, on two occasions, Ryan came close to being reunited with his parents and that the reason he was not so reunited was not the fault of either parent individually, but rather was the result of the fact that his parents could not interact well together. [Id., pp 80-81.]
Judge KELLY disagreed with the majority's conclusion in a sharply worded dissent:
I find there was clear and convincing evidence that respondent's parental rights should be terminated under MCL 712A.19a(f); MSA 27.3178(598.19a)(f). Respondent-appellant had a history of difficulty with his own parents and had abused this child dramatically on occasions....
There was ample testimony of alcohol abuse and physical assault and battery by the respondent upon the mother. There were extensive periods of time when visitation was minimal or totally neglected. The trial judge was fearful that respondent would merely repeat his past behavior and would neglect the child to go fishing or out drinking with his friends. The judge was also concerned about medical testimony concerning the child's emotional problems and he questioned whether a babysitter would be able to adequately deal with these emotional problems. [Id., pp 81-82.]
*337 III
The Court of Appeals recited the appropriate standard for appellate review of a trial court's findings with respect to termination of parental rights. In re Miller, supra, p 78. An appellate court should not reverse the findings of a trial court in such a case unless its findings are clearly erroneous. In re Irving, 134 Mich App 678, 679-680; 352 NW2d 295 (1984). "A finding is `clearly erroneous' [if] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." In re Riffe, 147 Mich App 658, 671; 382 NW2d 842 (1985); In re Cornet, 422 Mich 274, 278; 373 NW2d 536 (1985). For termination of parental rights cases, this standard of review is codified in the Michigan Court Rules. MCR 5.974(I).
The Court of Appeals did not address the important question of the deference to be accorded to the findings of the trier of fact. MCR 2.613(C) requires that in applying the principle that findings of fact may not be set aside unless clearly erroneous, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.
The deference required by MCR 2.613(C) can make a critical difference in difficult cases such as the one before us. In contrast to the reviewing court, the trier of fact has the advantage of being able to consider the demeanor of the witnesses in determining how much weight and credibility to accord their testimony. It is noteworthy that Probate Judge Donald S. Owens not only observed the demeanor of the witnesses during each of the two formal adjudications concerning Ryan Miller, but *338 he also presided over a number of pretrial conferences and dispositional hearings held during the fifty months of probate court temporary jurisdiction leading up to the termination order.
IV
In arguing that the Department of Social Services failed to establish by clear and convincing evidence that there was no reasonable probability that he would be able to establish a proper home for Ryan within the following twelve months, respondent Miller makes two claims: 1) that the probate court's decision was against the great weight of the evidence, and 2) that the probate court improperly shifted the burden of proof to him. We address these contentions separately.
A. WEIGHT OF THE EVIDENCE
Respondent Miller argues that the probate judge ignored or failed to give appropriate weight to some of the evidence. However, the probate judge's explanation of his findings convinces us that he did not ignore information, current or otherwise, which was favorable to Mr. Miller.
The probate judge explicitly acknowledged points in Mr. Miller's favor: his steady employment, a good record of financial support for the child, and generally acceptable compliance with the court's orders.[5] However, the judge was confronted *339 with disturbing evidence on the other side of the ledger as he looked for improvement in Miller's ability to be a proper parent. The record is replete with evidence, unacknowledged by the Court of Appeals panel, which supports the probate judge's order. For example, during the initial hearing on probate court jurisdiction, it was established that respondent had administered a spanking to ten-month-old Ryan for refusing to lay down in his crib and go to sleep. The spanking was so severe that a black and blue bruise the size of a man's hand appeared on the baby. The bruise attracted the concern of two neighbors as well as Ryan's maternal grandmother, all of whom testified at the hearing.
Indications of an unresolved alcohol abuse problem appear throughout the record. There was testimony that during Ryan's unsupervised visitations, respondent Miller would have little or nothing to do with Ryan's care; sometimes he would take off and go fishing for the day, and in the evenings he would drink heavily and pass out on the couch.[6]
After the toilet-training incident, respondent was arrested for a drunk driving violation for which he subsequently had his license suspended.
Sherry Miller testified that the assaultive confrontation which resulted in criminal charges being *340 filed was not an isolated incident. She testified, for example, that "when Glen's drinking, his mood changes," and that he sometimes "blacked out" and did "strange things."
During the supervised periods of visitation which occurred shortly before the permanent wardship hearing, the case worker observed angry, hostile behavior on Ryan's part toward both his parents.[7] Following the visits, Ryan often reverted to wetting the bed.
Without referring to these or other negative items in the record, the appeals panel majority concluded that the probate judge had placed undue emphasis on the 1984 toilet-training incident and the extended lapse in visitations which followed the filing of criminal charges against respondent. We disagree. The extensive findings by the probate judge show that the two incidents were not considered to the exclusion of other evidence.
Although the toilet-training incident occurred shortly after respondent had completed court-ordered parenting classes, he argued that the incident should not have been considered evidence of failure on his part to assimilate the parenting lessons because the limited supervised visitation schedule did not give him an adequate opportunity to practice his parenting skills. As the record clearly demonstrates, however, the probate court sought to encourage visitations. We do not fault the court for requiring that the visitations be held under the supervision of the case worker, in light *341 of the dramatic nature of the abuse which had occurred during an unsupervised visitation.
Furthermore, there is no question but that respondent was given the opportunity to work toward unsupervised, extended visitations. Respondent's argument would be more persuasive if the toilet-training incident had been followed by a pattern of progress toward establishing a stable home for Ryan. Instead, it was followed by a series of incidents, some of which have been noted, from which the probate court could reasonably infer that respondent's fitness for parenting had not improved.
Respondent also argued that incidents which did not occur in Ryan's presence should not have been considered in determining his parental fitness. However, the applicable statute requires the probate court to make an assessment of the probability that a parent will be able to establish a fit home for the child within twelve months. We believe that the extent of respondent's drinking and self-control problems, and the degree to which he was able to overcome them, were critical factors to be taken into account by the probate court in making this predictive assessment.
Evidence indicating that respondent had not improved in his ability to deal with frustration took on enhanced significance in light of testimony concerning Ryan's own emotional well-being. Dr. VanderJagt, a clinical psychologist who examined Ryan shortly before the termination hearing in December 1986, testified that the child was "emotionally traumatized" as the result of "some form of either abuse or neglect." When asked what would be necessary "to rehabilitate Ryan," the psychologist testified that he needed "a situation which will be very constant and calm," "firmness without anger." The psychologist further testified *342 that Ryan required a caregiver with "very good skills in terms of child management," "impulse control," and "more than the average amount of patience, persistence, and skill." This assessment of Ryan's emotional well-being contrasted with the report of a clinical psychologist in early 1985 which had described Ryan as a "normal" child. On the basis of the most recent examination, the probate judge determined that Ryan had suffered under temporary wardship to the extent that he had become a child with special needs. The judge concluded that although the respondent might be able to provide for Ryan's physical needs, he was not a fit parent to meet Ryan's emotional needs. We believe there is more than adequate support in the record to justify that conclusion.
We also disagree with the Court of Appeals conclusion that the nine-month lapse in visitations was given undue weight. The panel majority believed that respondent's prolonged failure to seek any contact with his son could be attributed to naivete rather than to a lack of caring for Ryan. In re Miller, supra, p 80. We conclude, however, that the contrary conclusion of the probate judge is more than adequately supported by the record. The case worker testified that when she learned that criminal charges had been filed against respondent, she terminated visitations; however, she immediately set up a conference with Glen and Sherry Miller for the next day. Neither of them showed up. The explanation later given was that they assumed that a request for further visitations would be futile until the criminal charges against respondent had been cleared up. However, neither Glen nor Sherry made any effort to confirm that assumption. Furthermore, the record reveals that the charges against respondent were dropped within "a few months" after they were filed because *343 Sherry's friends failed to appear at a hearing. Thereafter, at least four months or more elapsed without either parent seeking a resumption of visitations.
An underlying theme of respondent's arguments is that evidence of deficiencies in his parental fitness should be discounted because he is not to blame for such deficiencies. He contends that the absence of more positive evidence to demonstrate improvement in his fitness as a parent is directly attributable to his former wife's instability and to hostility on the part of his own parents.[8] This contention was apparently accepted by the appeals panel majority. In re Miller, supra, pp 80-81.
We do not agree. It is clear that the "extenuating circumstances" advanced by respondent were fully considered by the probate judge. In a lengthy opinion delivered from the bench, the probate judge specifically acknowledged the fact that respondent may have suffered inappropriate discipline as a child, that his relationship with his parents was severely strained, and that Sherry Miller had been an immature and irresponsible partner. In the end, however, the judge concluded that, regardless of the origin of respondent's personal problems, he had failed to overcome them sufficiently to be able to provide Ryan with a proper home.
We cannot fault the judge for concluding that, in a hearing brought under 1972 PA 59, § 19a(f), *344 the excuses put forward by respondent were not the equivalent of evidence of parental fitness. In the final analysis, the weight to be accorded one bit of evidence or another is inextricably intertwined with assessments concerning the credibility of the witnesses. The person best situated to make that determination is the probate judge who had the advantage of the opportunity, at intervals over a four-year period, to observe the demeanor and to assess the credibility of respondent and the other individuals involved. Giving due regard to this opportunity, as we are required to do by MCR 2.613(C), we conclude that the termination order entered by the probate court was not clearly erroneous.
B. BURDEN OF PROOF
On its face, the statute under which this termination proceeding was brought could be read as placing the burden of proof on the respondent. It provided that the court could place a child in the permanent custody of the court when
[t]he child has been in foster care in the temporary custody of the court on the basis of a neglect petition for a period of at least 2 years and upon rehearing the parents fail to establish a reasonable probability that they will be able to reestablish a proper home for the child within the following 12 months. [1972 PA 59, § 19a(f). Emphasis supplied.]
However, MCR 5.974(A)(2) makes clear that "[t]he burden of proof is on the party seeking by court order to terminate the rights of the respondent over the child." See also In re LaFlure, 48 Mich App 377, 384; 210 NW2d 482 (1973). (Shifting the burden of proof to the parents violates due process requirements.) Proofs must be "clear and convincing" *345 that one or more of the statutory grounds for termination exist to warrant severing the parent-child relationship. MCR 5.974(F)(3).
Although the burden of proof is on the party seeking to terminate parental rights, the burden of going forward with the evidence is on the parent or parents. In re Kantola, 139 Mich App 23, 28; 361 NW2d 20 (1984). A parent who fails to produce any evidence risks an adverse ruling on the evidence presented, but one who produces some indication that the family situation has improved has met the burden of going forward. In re LaFlure, supra, p 388. Meeting the burden of production, however, does not mean that the parent has necessarily prevailed.
There is no dispute that respondent in this case met his burden of going forward with the evidence. At issue is whether the probate judge improperly shifted the burden of proof to the respondent. We conclude from the record that the probate judge understood, and properly assigned, the burden of proof in this case.[9] During the hearing, he explained the requirements of § 19a(f) and correctly stated the law:
[I]f the Prosecution shows that the child's been in foster care on the basis of a neglect petition for a period of at least two years, that makes out a prima facie case which, if unrebutted by the parents, may establish that termination is warranted. The parents then have the burden of going forward with the evidence, though never have the *346 burden of proof, to show that there is a reasonable probability that they will be able to reestablish a proper home.
Later, in his concluding remarks, the judge observed that "subsection (f) does not shift the burden of proof, which is always with the state, but does shift the burden of going forward with the evidence."
V
The decision we reach today is one of the most difficult to be made by any court. As the United States Supreme Court has observed, it is "plain beyond the need for multiple citation that a parent's desire for and right to `the companionship, care, custody and management of his or her children,' is an important interest that `undeniably warrants deference and absent a powerful countervailing interest, protection.'" Lassiter v Dep't of Social Services, 452 US 18, 27; 101 S Ct 2153; 68 L Ed 2d 640 (1981), quoting Stanley v Illinois, 405 US 645, 651; 92 S Ct 1208; 31 L Ed 2d 551 (1972). See also Reist v Bay Co Circuit Judge, 396 Mich 326, 341-343; 241 NW2d 55 (1976).
Our law clearly reflects a strong preference for keeping a child within his own home to the extent that such a disposition is consistent with the child's welfare. MCL 712A.1; MSA 27.3178(598.1). At the same time, the need to protect the welfare of children in our society means there are times when parental rights must be terminated in order to give a child an opportunity for a stable, permanent home. The Legislature has provided a statutory framework which defines the circumstances under which termination is warranted. After carefully reviewing the record in this case, we reach *347 the conclusion that the probate court's order was in compliance with the requirements of 1972 PA 59, § 19a(f). The court did not clearly err in terminating respondent's parental rights.
Accordingly, we reverse in part the decision of the Court of Appeals, and reinstate the probate court's order terminating the respondent-father's parental rights. We affirm that portion of the Court of Appeals decision which remanded the case to the probate court to determine whether Sherry Miller was properly advised of her right to appellate review.
RILEY, C.J., and BRICKLEY, CAVANAGH, BOYLE, and ARCHER, JJ., concurred with GRIFFIN, J.
LEVIN, J. (dissenting).
I would affirm the decision of the Court of Appeals[1] reversing the probate court's order terminating the parental rights of Glen Miller because I agree with the conclusion of the Court of Appeals that the probate judge clearly erred in finding that there was clear and convincing evidence that there was not a reasonable probability that Glen Miller would be able within twelve months to reestablish a proper home for his son, Ryan Kyle Dean Miller.
NOTES
[1] In re Miller, 167 Mich App 75; 422 NW2d 1 (1988).
[2] Ryan's mother, Sherry Miller, did not appeal the termination of her parental rights. However, she appeared at oral argument before the Court of Appeals and complained that she had never received notice of her right to appeal. We affirm that portion of the Court of Appeals decision which remanded the case to the probate court to determine whether Sherry Miller was properly advised of her rights with respect to appellate review of the probate court's decision. MCR 5.974(H).
[3] 1972 PA 59, § 19a(f). This provision has been superseded by 1988 PA 224, effective April 1, 1989.
[4] The case worker had been led to believe that "things were going well" with Glen and Sherry during this period when in fact Sherry had left the marital home, and was gone for eight weeks, staying with friends. The illegal entry and assault charges were eventually dropped when the friends failed to appear at a court hearing on the matter.
[5] The findings of the probate court do not refer to the testimony of respondent's therapist, who testified that the respondent had made significant progress, and that she thought it possible that he could be "an appropriate and effective parent" to Ryan within the statutory deadline of twelve months. We do not find this omission significant. On cross-examination, it was established that her conclusions were based entirely on respondent's own reports to her, uncorroborated by any other evidence: she had not reviewed any of the clinical evaluations or case worker reports available to the court, and she had never observed the respondent and his son together. Under these circumstances, it was well within the discretion of the trier of fact to choose not to rely on the therapist's testimony.
[6] This testimony by the paternal grandmother was based on reports given to her by Sherry Miller. At a hearing on termination of parental rights brought under MCL 712A.19a; MSA 27.3178(598.19a), hearsay evidence may be considered if it is relevant and material. See MCR 5.974(F)(2) which provides in part: "At the hearing all relevant and material evidence, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value, even though such evidence may not be admissible at trial." See also In re Kantola, 139 Mich App 23; 361 NW2d 20 (1984).
[7] between Ryan, Glen and Sherry occurred on 6-11-86; 6-25-86; and 7-16-86. During these visits, Ryan was visably [sic] anxiety ridden, he failed to make and sustain contact with his parents.... He concentrated on the typewriter, not his parents. He continually sought reassurance that he was not going to their house. He refused to go into the same room as his parents....
[8] We note that a theme contrapuntal to respondent's evidence at the termination hearing and to his appellate arguments is the alleged deficiencies of his parents as caregivers for Ryan. The probate judge correctly observed that in determining whether to terminate parental rights, the relative value of other placements for the child is not a consideration. "[T]he proper inquiry is whether the state has proven respondent unfit by clear and convincing evidence according to statutory standards, and not whether the minor children would be better off in a foster home." In re Bedwell, 160 Mich App 168, 173; 408 NW2d 65 (1987).
[9] We have not overlooked that at one point the judge paraphrased the language of 1972 PA 59, § 19a(f), and said, "Weighing the parents' plans, the Court finds that they have put forward plans, each of them. The Court finds, however, by clear and convincing evidence, that they have failed to establish a reasonable probability that either parent or both together  now it's either one because they're getting divorced  will be able to establish a proper home for the child within the next twelve months."
[1] In re Miller, 167 Mich 75; 422 NW2d 1 (1988).