*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

In re CLEVELAND/GRANT/WEAVER, Minors.

UNPUBLISHED
October 15, 2019

No. 343832
Wayne Circuit Court
Family Division
LC No. 17-001147-NA

Before: O'BRIEN, P.J., and BECKERING and LETICA, JJ.

O'BRIEN, J. (*dissenting*)

I would conclude that the trial court clearly erred when it ruled that SW placed AMC in the tub. Because of this, there is no plausible explanation for how AMC was injured. Without an explanation for AMC's injuries, I would conclude that the trial court clearly erred when it found that the children are not at risk of harm if returned to respondent's home. But even accepting the trial court's conclusion that SW placed AMC in the tub, I would conclude that the children are still at risk of harm if returned to respondent's home based on respondent's refusal to accept responsibility for her actions and to instead blame her then-four-year-old son for AMC's injuries. For these reasons, I would reverse and remand for further proceedings.

AMC suffered second- and third-degree burns to 70% of her body while in respondent's care. The injuries occurred while respondent was home with AMC, AC, and SW. Respondent placed AMC and her twin brother, AC—who were eight months old at the time—outside of the bathroom, while she went to collect items for them to take to their babysitter's. According to respondent, during this time her then-four-year-old son, SW, went into the bathroom near AMC and AC, drew a bath in a baby tub left in the larger bathtub, picked up AMC, and placed her in the baby tub. Respondent testified that she never heard AMC scream, but heard AMC "like whining." When respondent walked back to check on AC and AMC, she saw that AMC was in the tub, so she hurried over and pulled AMC out. AMC's skin instantly began to blister and peel off, and respondent rushed AMC to the hospital.

At trial, now-five-year-old SW testified—at respondent's request—wearing a Batman outfit and asked to be called Batman. SW confirmed certain aspects of respondent's testimony, namely that he was responsible for placing AMC in the hot water that caused her burns, and that AMC did not scream when she was placed in the water but "was moving around making

sounds." Yet SW testified that he placed AMC in the tub because respondent had asked him to help her bathe AMC and AC. Respondent, on the other hand, testified that this portion of SW's testimony was a lie.

Respondent stated that what happened to AMC was "not in [her] control" and that it was "something that happened out of [her] control." When asked if she did anything wrong, respondent said,

> Yeah, I kept my head turned too long and it resulted in my baby being burned and almost losing her life. But as far as causing her injuries, it's not on me because if [SW] wouldn't have been home that day then we wouldn't be here today because that way [AMC] would have never ended up in the bathtub getting burned.

Respondent also testified that at the time AMC was injured, respondent was using marijuana every other day.

The parties stipulated that Dr. Marc Cullen, the chief of pediatric surgery at St. John's Hospital where AMC was initially treated, was an expert in pediatric surgery and a "burns specialist." Dr. Cullen testified that when he first treated AMC's burns, she "was minimally responsive" and "was in shock," so he did not give her any medication because he was afraid "she would stop breathing." Dr. Cullen explained that AMC had a combination of severe second- and third-degree burns, and described the injuries as "life-threatening." Dr. Cullen explained that AMC would have to undergo treatment for years (including the three months she had to spend in the hospital before she could be released), and that she would likely be dealing with the effects of her injuries for the rest of her life.

Dr. Cullen estimated that for AMC to suffer the severity of the burns she suffered (meaning for the burns to be as deep as they were), she would have had to be in 133°F water for 15 to 20 seconds.[1] Dr. Cullen explained that, at 133 degrees, "no one can say 'I didn't know [the water] was that hot. That is not credible." Dr. Cullen testified that there was "no question" that, with water that hot, an eight-month-old baby would immediately start crying if placed in it. Dr. Cullen clarified that "100 percent" there would have been an initial scream, and that if the baby went into shock, it would be at some time after the injury from "pain and fluid losses associated with" the injury. Dr. Cullen opined that it "stretches the imagination" that a four-year-old child would be "physically capable of lifting a baby over the edge of the tub for a perfect two point landing into a tub within a tub scenario." Dr. Cullen further opined that this explanation was "discordant" and was "not a one to one match with the child's injuries."

During closing arguments, petitioner argued that respondent's explanation that SW caused AMC's injuries was not plausible. The trial court disagreed, and found that SW placed AMC in the water. The trial court ultimately determined that it could not "necessarily say that if

---

[1] Dr. Cullen explained that he based his estimate on the time that AMC was likely in the water according to the people interviewed at the hospital when AMC was brought in.

this child was put back in [respondent's] home it's going to get injured again," and, therefore, it found that there were no statutory grounds to terminate respondent's parental rights.

First addressing the trial court's factual finding that SW placed AMC in the baby tub, this Court's review is for clear error. See *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). A finding is clearly erroneous if, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id*.

I would conclude that the trial court's finding that SW placed AMC in the baby tub was clearly erroneous. While respondent's and SW's testimony support this conclusion, I agree with Dr. Cullen that their explanation—that a four-year-old child was able to pick up an eight-month-old baby, lift her over the side of a tub, and place her perfectly in a baby tub inside a larger bathtub—"stretches the imagination." Moreover, I believe that it is patently incredible that an eight-month-old child would not scream when placed in scalding-hot water.[2] As explained by Dr. Cullen, if the child were to go into shock, the shock would not set in until sometime after the injury from "pain and fluid losses." Ultimately, there is no plausible explanation for how AMC was placed in the tub and remained in the tub long enough to sustain second- and third-degree burns to over two-thirds of her body, yet it is undisputed that, when this happened, respondent was home and was supposed to be watching over the child.

On these facts, I would conclude that petitioner established by clear and convincing evidence grounds for termination under MCL 712A.19b(3)(j), and that the trial court clearly erred by holding otherwise.[3] MCL 712A.19b(3)(j) provides that a trial court may terminate a parent's parental rights if it finds by clear and convincing evidence that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Without a plausible explanation for how AMC suffered such horrendous injuries, I cannot conclude that AMC, or any of the other children, would be safe if returned to respondent's home.[4] I would hold that the trial court clearly erred by holding otherwise.

I would also conclude that termination would have been proper under MCL 712A.19b(3)(g), which provides that a trial court may terminate a parent's parental rights if "[t]he parent, without regard to intent, fails to provide proper care or custody for the child and

---

[2] Dr. Cullen acknowledged that AMC could have been in less hot water—like 124-degree water—for a longer time and suffered the same injuries, but he explained that even 124-degree water would be scalding hot to an adult.

[3] "To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013), lv den 495 Mich 856 (2013). This Court "review[s] for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence." *Id*.

[4] The other children would be in danger of injury in respondent's home based on the doctrine of anticipatory neglect. See *In re LaFrance*, 306 Mich App at 730.

there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." In *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011), this Court explained, "When there is severe injury to an infant, it does not matter whether respondents committed the abuse at all, because under these circumstances there was clear and convincing evidence that they did not provide proper care." It is undisputed that eight-month-old AMC suffered severe injuries. And, as already explained, I would conclude that there is no plausible explanation for how she suffered those injuries. Under such circumstances, I would conclude that the trial court clearly erred by holding that petitioner did not establish by clear and convincing evidence grounds for termination under MCL 712A.19b(3)(g). *In re Ellis*, 294 Mich App at 33.

But even accepting the trial court's finding that SW placed AMC in the baby tub, I would conclude that the trial court clearly erred by not terminating respondent's rights under MCL 712A.19b(3)(j). It is undisputed that AMC suffered a severe physical injury—she had second- and third-degree burns to 70% of her body. AMC required three months of hospitalization following the injury, as well as extensive and ongoing follow-up treatment and therapy. Yet respondent admitted in her testimony that she could have prevented this injury. She testified that she kept her "head turned too long and it resulted in [AMC] being burned and almost losing her life." Indeed, this is the type of accident that parents generally have the opportunity to prevent. Accepting respondent's version of how AMC was injured, SW drew a bath (which respondent, for whatever reason, could not hear[5]), got the water hot enough to cause third-degree burns to an eight-month-old child, took off AMC's diaper, carried AMC into the bathroom, lifted AMC over the side of the bathtub, placed AMC in the baby bathtub, and left her in there long enough to cause third-degree burns. Given this sequence of events, respondent was clearly not keeping a reasonable watch over the children when AMC was injured.

While the trial court found that respondent was remorseful, respondent's remorse, standing alone, could not ensure the safety of the children in her home. The children's safety can only be reasonably assured if respondent understands how AMC was injured in the first place— that is, if she understands that she caused AMC's injuries by failing to properly supervise AMC and SW. The record reflects that respondent refuses to see this; she refuses to accept responsibility for her role in causing AMC's injuries, and chooses instead to place the fault squarely on the shoulders of then-four-year-old SW. Respondent described what happened to AMC as "something that happened out of [her] control." Yet it clearly was not out of her control; if she had kept a closer eye on SW and the twins, then she could have prevented AMC's injuries. Even so, she testified that

---

[5] Respondent testified that she never heard any water running even though "[i]t wasn't too loud or anything" in the house at that time.

-4-

as far as causing [AMC's] injuries, it's not on me because if [SW] wouldn't have been home that day then we wouldn't be here today because that way [AMC] would have never ended up in the bathtub getting burned.[6]

SW was a four-year-old child when AMC was injured. Accepting that his actions may have directly caused AMC's burns, respondent's failure to properly supervise SW would have also caused AMC's burns. Respondent was correct that if SW had not placed AMC in the tub on *that day* then AMC would not have been burned on *that day*, but no one can say that the same thing would not have happened on *a different* day. Indeed, there can be no reasonable assurance that the same thing won't happen *in the future* if the children are placed in respondent's home. SW would still be in the home with AC and AMC, and because respondent does not understand how she, too, caused AMC's injuries, it is unclear what respondent would do differently so that this type of horrible accident would not happen again.

In sum, even accepting the trial court's factual findings, respondent played a role in causing AMC's injuries, but she appears to not understand this and instead places the blame solely on SW. By placing the blame for AMC's injuries on SW, and by failing to understand that her actions, too, put AMC in danger and caused her injuries, there was a reasonable likelihood, based on respondent's conduct or capacity, that the children will be harmed if returned to her home.

This conclusion is supported by the Clinic for Child Study report, which stated:

> [Respondent] does a very poor job of accepting any responsibility for monitoring her children, resents the intervention of authority figures, and externalizes blame onto her four-year-old son, maintaining that the burns on her daughter were the result of his actions. Even if we accept that he could run the bathwater, take off his sister's diaper, carry her from one room to another without dropping her and place her in the scalding hot liquid, [respondent's] assertions that this makes him the culprit showed very little parenting ability.
>
> *   *   *
>
> [E]ven the explanation [respondent] believes exonerates her from guilt proves to be extremely neglectful. For example, knowing that [SW] is an active and challenging child, she still did not exercise greater care of him or her twins, suggesting this or similar threat to life and limb could happen again when outside the purview of the court.

---

[6] This testimony immediately followed respondent's admission that she "kept [her] head turned too long . . . ." I cannot conclude that this admission was, as the majority believes, an "acknowledgment [by respondent] that AMC's injuries were ultimately her fault . . . ." Rather, I think that respondent's testimony immediately following this admission shows that she refused to acknowledge that she was to blame for AMC's injuries because, according to respondent, SW was solely to blame.

> Individuals who do not acknowledge their shortcomings do not learn from their mistakes and are highly likely to repeat previous patterns[.]

For these reasons, I would conclude that the trial court clearly erred by finding that petitioner failed to establish by clear and convincing evidence at least one statutory ground for termination. I therefore respectfully dissent.

/s/ Colleen A. O'Brien