*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* K. C. LANE, Minor.

UNPUBLISHED
January 12, 2023

Nos. 360816; 360826
Wayne Circuit Court
Family Division
LC No. 2007-468721-NA

Before: M. J. KELLY, P.J., and BOONSTRA and SWARTZLE, JJ.

PER CURIAM.

In Docket No. 360816 of these consolidated appeals,[1] respondent-mother appeals by right the trial court's order terminating her parental rights to her minor child, KCL, under MCL 712A.19b(3)(g), (i), and (j). In Docket No. 360826, respondent-father appeals by right the same order, which also terminated his parental rights to KCL under MCL 712A.19b(3)(g) and (j). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Respondents are the parents of KCL, born in September 2020.[2] Between April 2020 and KCL's birth, respondent-mother reported to police that respondent-father had assaulted her on at least four separate occasions, including physically assaulting respondent-mother approximately

---

[1] See *In re KCL*, unpublished order of the Court of Appeals, entered April 5, 2022 (Docket Nos. 360816, 360826).

[2] Respondent-mother testified that she believed respondent-father was also the father of another of her children, MR, to whom her rights had been terminated in a prior proceeding. Respondent-father's testimony was inconsistent regarding the number of children he believed he had fathered with respondent-mother. From the record available to this Court, it does not appear that respondent-father ever executed an affidavit of parentage or otherwise established paternity with MR; in the proceedings involving MR, the trial court terminated the parental rights of MR's "unascertainable father." See *In re Hooks/Wright/Tolbert/White/Rivers/Dozier,* unpublished per curiam opinion of the Court of Appeals, issued March 3, 2020 (Docket No. 349658).

three days before KCL's birth. Respondent-father has an extensive history of convictions for assault crimes.

KCL was immediately hospitalized after her birth for a medical condition and remained hospitalized for 10 days; she was subsequently discharged to the care of her maternal cousin as part of a Children's Protective Services (CPS) safety plan. In November 2020, petitioner, the Department of Health and Human Services (DHHS or petitioner), filed a petition seeking termination of respondent-mother's parental rights; the petition was amended to include respondent-father after he executed an affidavit of parentage. Petitioner alleged that KCL had tested positive for THC (the active ingredient in marijuana) at birth, that respondent-father had frequently assaulted respondent-mother and had been arrested several times for domestic assault, that respondent-mother remained in the relationship despite domestic violence, and that respondent-mother's rights to seven other children had been previously terminated. The trial court authorized the petition.

The adjudication trial was held in September 2021. At the trial, counsel for petitioner informed the trial court that there was a current no-contact order between the parties. A sergeant with the River Rouge police testified that respondent-mother had reported at least four instances of domestic assault by respondent-father, including the incident shortly before KCL's birth. The sergeant also testified that respondent-mother had been arrested in 2020 for resisting or obstructing an officer. Respondent-father also testified and denied physically assaulting respondent-mother, although he admitted to having several prior assault convictions, and admitted that he was currently on probation for a 2021 conviction for resisting or obstructing an officer. He also testified that he had been diagnosed with schizophrenia and received aid from a community mental health agency, although he admitted to not taking his prescribed medication. Respondent-father testified that he was employed full-time as a landscaper, lived in an apartment, and received food assistance benefits. He further testified that he intended to live together with respondent-mother and KCL in the future, and denied that KCL had any medical conditions or special needs.

Respondent-mother testified that she ran an online business, had received government assistance to pay her utility bills, and had been renting a four-bedroom house since 2017. She testified that respondent-father had physically assaulted her four or five times while she was pregnant with KCL, including punching her in the face on two or three occasions and one incident in which he threatened her with a gun (although respondent-mother testified that it might have been a "BB" gun). Respondent-mother also testified that she had been diagnosed with cancer and was currently receiving chemotherapy treatments; she would need surgery and radiation treatment in the future. Respondent-mother also testified that she had been diagnosed with major depressive disorder and was seeing a therapist. Respondent-mother admitted that she had been arrested for assaulting her neighbor in June 2021 and was currently wearing an electronic monitoring device. She could not return to the house she was renting because of a no-contact order with her neighbor, and was currently living in a hotel.

After hearing testimony from respondents and their foster care worker, the trial court found that KCL came within its jurisdiction based on the conduct of both respondents, especially because of ongoing issues with domestic violence. The trial court then proceeded to the dispositional phase. Although the petition had sought termination of respondents' parental rights at the initial disposition, the trial court ordered that respondents be offered services and parent-agency plan.

The trial court ordered that respondents were to obtain and maintain suitable housing and income, keep in contact with the caseworker, participate in a psychological evaluation, attend therapy that included a domestic violence component, and sign the necessary releases. The court also ordered that each respondent be provided with a parent-partner and that referrals be made for Infant Mental Health and Early On services. The court permitted supervised parenting time.

The dispositional hearing continued in November 2021; respondent-father was not present. Respondent-mother's caseworker testified that she had encountered difficulty in scheduling some supportive services, possibly because of the COVID-19 pandemic. The caseworker noted that neither respondent had completed a domestic violence intake assessment despite having been referred to a counseling agency and given the necessary contact information. Respondent-mother had not resolved her housing issues but was searching for alternative housing.

The dispositional hearing continued again in February 2022; this time the trial court referred to the hearing explicitly as a termination hearing. Respondent-father was again not present; the caseworker testified that she had not had contact with respondent-father since the end of 2021 despite attempts to contact him. Further, the caseworker testified that respondent-father had arrived for his last three parenting-time visits smelling of alcohol. Respondent-father left these visits after only 15 to 30 minutes. The caseworker also testified that respondent-father had been convicted of domestic violence against respondent-mother in 2021, and was currently on probation for that conviction. Respondent-father was not permitted to have contact with respondent mother under the terms of his probation. Nonetheless, the caseworker testified that she had observed respondents arriving together for supervised parenting time visits, despite their visitation times being staggered.

The caseworker testified that respondent-mother was easily upset during supervised parenting time and would act aggressively toward caseworkers, KCL's caregiver, and other adults. However, the caseworker testified that respondent-mother interacted appropriately with KCL during supervised parenting time. The caseworker testified that it appeared that respondent-mother was still in contact with respondent-father despite the terms of respondent-father's probation. Respondent-mother had not verified a source of income and was not currently receiving government assistance other than assistance to pay for hotels. The caseworker testified that respondent-mother had always described her cancer as "terminal," although the caseworker had not independently verified either the diagnosis or the prognosis. Respondent-mother had not followed through on an intake assessment for domestic violence counseling, but did undergo a psychological evaluation, which had recommended that she continue her individual counseling.

The caseworker testified that neither respondent would provide authorization for an eye surgery to correct KCL's vision in one eye. Respondent-mother testified that she had not been informed that the surgery was urgent and that she had wanted to wait until KCL was older; however, if the surgery was urgent, she was willing to give her consent. Respondent-mother also testified that her breast cancer had been diagnosed as "Stage II" and admitted that her oncologist had not described it as "terminal"; however, she stated that she believed she was terminally ill because "cancer can be deadly." Respondent-mother denied being in contact or in a relationship with respondent-father, although she admitted that she had previously allowed him to accompany her to parenting time visits. Respondent-mother's criminal charges from June 2021 were still pending and included charges for assault, resisting arrest, and possibly home invasion.

At the conclusion of the hearing, the trial court found clear and convincing evidence to terminate respondent-mother's parental rights under MCL 712A.19b(3)(g), (i), and (j), and grounds to terminate respondent-father's parental rights under MCL 712A.19b(3)(g) and (j). The court noted the numerous incidents of domestic violence between respondents, and that respondents continued to have contact with each other. The court also noted that respondent-mother, despite the history of domestic violence and prior terminations, believed that respondent-father was not a threat to their daughter. Regarding respondent-father specifically, the court emphasized his failure to attend the termination hearing and noted that respondent-father had not visited KCL in months or kept in contact with the caseworker or his attorney. Turning to the best-interest determination, the court concluded that in light of KCL's young age, her special needs, and her need for permanence and stability, termination of respondents' parental rights was in the child's best interests. These appeals followed.

## II. DOCKET NO. 360816 (RESPONDENT-MOTHER)

### A. STATUTORY GROUNDS

Respondent-mother argues that the trial court erred by holding that statutory grounds for termination of her parental rights had been proven by clear and convincing evidence. We disagree.

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence; this Court reviews for clear error the trial court's decision to terminate parental rights. *In re Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000). MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent-mother's parental rights pursuant to MCL 712A.19b(3)(g), (i), and (j), which permit termination of parental rights under the following circumstances:

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (i) Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and the parent has failed to rectify the conditions that led to the prior termination of parental rights.
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court did not clearly err when it found that the evidence supported termination on these grounds. The evidence established that in 2019, respondent-mother's parental rights to seven

older children were terminated under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j) due to the repeated endangerment of those children, neglect of their basic needs, and failure to provide needed medical treatment; respondent-mother had also allowed a man convicted of child sexual abuse to have contact with her children. In this earlier proceeding, respondent-mother was offered a multitude of services over the course of several years, but she did not adequately participate in or benefit from the services offered. Respondent-mother had not meaningfully addressed her mental health issues, domestic violence, unstable housing, and poor parenting skills.

Six months after this Court affirmed the termination of respondent-mother's parental rights to her other children,[3] she gave birth to KCL, who tested positive for THC at the time of her birth and possessed additional special needs at birth that required extensive hospitalization. Further, only three days before the birth, the police were called to respondent-mother's home to investigate one of many domestic assaults perpetrated by respondent-father on respondent-mother. In light of respondent-mother's history, DHHS filed a petition seeking termination of parental rights at the initial disposition. After the adjudication, despite the filing of the permanent-custody petition, the court ordered DHHS to provide both respondents with a treatment plan. In addition, according to respondent-mother's own testimony, she was also receiving, on her own accord, individual and domestic violence counseling and housing assistance. Notwithstanding these services, at the time of termination, respondent-mother had shown no improvement in her ability to care for a child or provide a safe and stable home.

At the time of the February 2022 termination hearing, respondent-mother had been living in her car for approximately a month. She was unable to live in the house she had rented for years (with government assistance) because of an altercation with a neighbor that had resulted in criminal charges that were still pending at the time of termination. Moreover, respondent-mother's altercation with the neighbor was not an isolated incident. During the 18 months that the child was in care, respondent-mother clashed with the relative caregiver, the caseworker, and other agency staff. Individuals supervising visits were instructed by the caseworker to have as little contact with respondent-mother as possible because she was easily triggered and would act out aggressively. Arrival for parenting time at the agency was staggered to reduce the chance that respondent-mother and KCL's caregiver would interact.

Respondent-mother also demonstrated that she lacked insight into how to keep her child safe from known risks of harm. In the months preceding KCL's birth, the police were called to respondent-mother's home several times to investigate domestic violence complaints. Respondent-mother testified that respondent-father physically assaulted her four or five times. On at least three occasions, he struck her in the face. Respondent-mother testified that her eye was chronically swollen because of a detached retina. Although there was no direct evidence that the detached retina was caused by respondent-father's assaults, based on respondent-mother's testimony that respondent-father had struck her in the face multiple times, it was entirely possible. Three days before respondent-mother gave birth to the child, respondent-father struck respondent-

---

[3] See *In re Hooks/Wright/Tolbert/White/Rivers/Dozier*, unpublished per curiam opinion of the Court of Appeals, issued March 3, 2020 (Docket No. 349658).

mother twice in the back of the head after he was angered by something he saw on respondent-mother's cell phone.

Despite these attacks, respondent-mother refused to cooperate in pressing charges against respondent-father and she continued to have contact with him despite a no-contact order between them. Respondents were granted separate parenting times, on different days, but they were seen arriving together to respondent-mother's parenting time. Although they both denied being in a continuing relationship or living together, respondent-father admitted at the September 2021 adjudication trial that he used respondent-mother's address to receive his mail. Respondent-mother admitted at the February 2022 termination hearing that she had spoken to respondent-father the weekend before. Respondent-mother also asserted that despite their violent history, she still believed that KCL would benefit from a relationship with respondent-father. From this testimony, the court could infer that respondent-mother would be unable to identify and keep KCL safe from risks of harm if she were returned to her care.

At the time of the termination hearing, respondent-mother continued to demonstrate erratic, even physically violent, behavior when stressed. She had no verified source of income, she continued to maintain a relationship with her domestic abuser, and she was essentially homeless. In essence, respondent-mother exhibited the exact same behaviors and conduct that precipitated the termination of her parental rights to her seven older children. All of the issues that had led to the prior termination of her parental rights, including emotional instability, housing instability, and lack of parenting skills, were still present in the instant case. Respondent-mother was in no better position to parent KCL than she had been when her parental rights to the older children were terminated.

The trial court took judicial notice of respondent-mother's history with CPS and the prior termination of her parental rights. This constituted clear and convincing evidence that respondent-mother's parental rights to the child's siblings were terminated due to serious and chronic neglect. Further, respondent-mother's failure to meaningfully participate in or benefit from services both before and after KCL's birth clearly and convincingly established that respondent-mother had failed to rectify the conditions that had led to the prior termination of her parental rights. Indeed, there was overwhelming evidence that respondent-mother, either because she was unwilling or unable, had not adequately addressed her mental health issues, had not improved her parenting skills, and still was unable to obtain and maintain suitable and stable housing. Accordingly, the trial court did not clearly err when it terminated respondent-mother's parental rights to the child under MCL 712A.19b(3)(i).

Because only one statutory ground is required to terminate a respondent's parental rights, it is unnecessary to address the additional statutory grounds. *In re Frey,* 297 Mich App 242, 244; 824 NW2d 568 (2012). However, we note that much of the same evidence we have discussed, apart from the evidence related to prior terminations, also supports termination of respondent-mother's parental rights under MCL 712A.19b(3)(g) and (j). The evidence presented at the termination hearing provided clear and convincing evidence that KCL would be at significant risk of harm if returned to respondent-mother's care. Respondent-mother lacked the parenting skills to safely and properly provide for KCL's most basic needs. Moreover, her emotional volatility put the child at grave risk of harm. Accordingly, the trial court did not clearly err by finding that

the evidence also supported termination of respondent-mother's parental rights under MCL 712A.19b(3)(g) and (j).

## B. BEST-INTEREST DETERMINATION

Respondent-mother also argues in passing that the trial court erred when it concluded that termination of her parental rights was in the child's best interests. However, other than this conclusory statement, respondent-mother has not supported her argument with facts or law. We could decline to address her argument on this basis. "A party cannot simply assert an error or announce a position and then leave it to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for his argument, and then research for authority either to sustain or reject his position." *Mitchell v Mitchell*, 296 Mich App 513, 524; 823 NW2d 153 (2012) (citation omitted).

In any event, the trial court did not clearly err in this regard. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones,* 286 Mich App 126, 129; 777 NW2d 728 (2009). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White,* 303 Mich App 701, 713; 846 NW2d 61 (2014). In considering the child's best interests, the trial court's focus must be on the child and not the parent. *In re Moss,* 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id.* at 90. This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones,* 286 Mich App at 129.

A preponderance of the evidence established that termination of respondent-mother's parental rights was in KCL's best interests. KCL would not be safe in respondent-mother's care and there was no evidence that respondent-mother would be able to provide a safe and stable home for her. Moreover, many of the factors discussed below in respondent-father's challenge to the trial court's best-interest decision are equally applicable to respondent-mother. Although some bond likely exists between respondent-mother and KCL, the existence of such a bond does not outweigh the grave risks to KCL's health and well-being if returned to respondent-mother's care.

## III. DOCKET NO. 360826 (RESPONDENT-FATHER)

## A. STATUTORY GROUNDS

Respondent-father argues that the trial court erred by finding that statutory grounds to terminate his parental rights to KCL under MCL 712A.19b(3)(g) and (j) had been proven by clear and convincing evidence. We disagree.

The record establishes that respondent-father was not present at the time of KCL's birth, he did not meet her for the first time until she was approximately a month old, and he did not establish paternity until after this child protective proceeding was initiated. There was also evidence that respondent-father physically abused respondent-mother on multiple occasions, that he was charged with and convicted of domestic violence, and that he was on probation for these charges. Indeed, the evidence established that respondent-father had struck respondent-mother in the head three days before she was scheduled to give birth to KCL. After the court found sufficient evidence to take jurisdiction over KCL, respondent-father was offered a court-ordered treatment plan. However, in the months that followed, he did not communicate with the caseworker or his attorney, did not regularly attend court hearings, and stopped attending parenting-time visits. Indeed, at the time of termination, it had been approximately three months since respondent-father had seen KCL, and his last several visits had been brief and demonstrated inappropriate behavior by respondent-father.

Considering the foregoing circumstances, there was clear and convincing evidence that respondent-father could not provide proper care for KCL and that the child would be at risk of harm in his care. Accordingly, the trial court did not clearly err when it terminated respondent-father's parental rights under MCL 712A.19b(3)(g) and (j).

Respondent-father also argues that petitioner did not make reasonable efforts toward reunification. Respondent-father asserts that he was not given a fair chance to benefit from services and complete a treatment plan. However, although respondent-father is correct that petitioner could not fund certain services because of internal policy, the record shows that the caseworker was still able to refer respondent-father to several community resources that respondent-father did not pursue. Further, respondent-father stopped attending parenting time approximately three months before the termination hearing, despite having been provided with transportation assistance. Respondent-father cut his last three parenting-time visits short and smelled of alcohol. Respondent-father failed to maintain communication with the caseworker or his attorney. He failed to attend several critical court hearings. In short, the record clearly supports the conclusion that respondent-father quickly became unwilling to participate in *any* services offered by petitioner, or indeed in the child protective proceedings at all.

Although DHHS "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey,* 297 Mich App at 248. "Not only must respondent cooperate and participate in the services [he] must benefit from them." *In re TK,* 306 Mich App at 711. The record indicates that DHHS and other agencies offered respondent-father several services to help reunify him with KCL but respondent-father refused to participate in the services that were offered. Under these circumstances, we reject respondent-father's argument that DHHS failed to make reasonable efforts toward reunification.

## B. BEST-INTEREST DETERMINATION

Respondent-father also argues that the trial court erred by finding that termination of his parental rights was in KCL's best interests. We disagree.

KCL was 18 months old at the time the court terminated respondents' parental rights. She had been placed in the care of a maternal cousin since shortly after her birth. KCL was doing well in this placement, all her needs were being met, and the relative caregiver, fully aware of KCL's medical needs, had expressed an interest in adopting her if respondents' parental rights were terminated.

By contrast, as discussed, neither respondent could safely parent KCL or provide her with a safe and stable home. Respondent-father had not addressed his severe domestic violence and anger issues and had not demonstrated that he would put KCL's interests ahead of his own. There was also evidence that respondent-father could not manage KCL's special needs. KCL was developmentally delayed and required physical therapy and other therapeutic services to thrive. Despite this, respondent-father denied that KCL had any medical condition or special needs. He and respondent-mother had refused to authorize eye surgery that would have corrected an impairment to KCL's vision.

When balancing the best-interest factors, a court may consider the advantage of a foster home over the parent's home and the possibility of adoption. *Olive/Metts*, 297 Mich App at 42. In this case, when balancing the home provided by KCL's caregiver against the home that could be provided by respondent-father, it is clear that these factors weighed in favor of terminating respondent-father's parental rights.

Although KCL's placement with a relative weighs against termination, a trial court may terminate parental rights despite such placement if it finds that termination of parental rights is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. In this case, the relationship between respondents and KCL's caregiver was extremely volatile. Further, KCL's caregiver wished to adopt her if respondents' parental rights were terminated. Considering this, as well as KCL's young age, and respondent-father's inability to meet the child's special needs, a less restrictive option was simply not feasible. Therefore, notwithstanding the child's placement with a relative, the trial court did not clearly err when it found that termination of respondent-father's parental rights was in the child's best interests.

In sum, the evidence indicates that respondent-father was not able to safely parent KCL. By contrast, the child was thriving in a stable home where her needs were being met. Termination of respondent-father's parental rights was the best avenue for KCL to achieve stability, permanence, and finality. Accordingly, the trial court did not clearly err when it found that termination of respondents' parental rights was in the child's best interests. *In re Jones,* 286 Mich App at 129.

Affirmed in both dockets.

/s/ Michael J. Kelly
/s/ Mark T. Boonstra
/s/ Brock A. Swartzle