*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HUNTER/JENKINS, Minors.

UNPUBLISHED
November 9, 2021

No. 357093
Oakland Circuit Court
Family Division
LC No. 18-867792-NA

Before: CAVANAGH, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Respondent-mother, S. T. Hodges, appeals as of right the trial court's order terminating her parental rights to her sons, DH and IJ. The court terminated respondent's parental rights to DH under MCL 712A.19b(3)(c)(*i*), (g), and (j), and terminated her parental rights to IJ under MCL 712A.19b(3)(b)(*i*), (g), (j), and (k)(*iii*). We affirm.

In October 2018, Children's Protective Services (CPS) investigated a complaint that respondent, while intoxicated, abused her son, DH, then nine years old. DH suffered injuries that required medical attention. Respondent later pleaded no contest to third-degree child abuse and was sentenced to probation. DH participated in a forensic interview during which he made certain disclosures. Shortly thereafter, the Department of Health and Human Services (DHHS) filed a petition requesting that the court take jurisdiction over DH and make him a temporary court ward. In November 2018, respondent entered a no-contest plea to the allegations in the petition. The court accepted the plea and found that DH came within the court's jurisdiction under MCL 712A.2(b). Thereafter, the court adopted a parent-agency treatment plan that required respondent to submit to random drug screens, obtain and maintain suitable housing and income, submit to a psychological evaluation and comply with the recommendations therein, participate in counseling, complete a parenting class, comply with the terms of her probation, and attend parenting time.

During the year that followed, review hearings were held at regular intervals. It was frequently reported at these hearings that respondent's compliance with and benefit from her treatment plan was inconsistent. After 18 months of services, petitioner filed a supplemental petition in May 2020, seeking termination of respondent's parental rights to DH under MCL 712A.19b(3)(c)(*i*), (g), and (j). Shortly thereafter, respondent gave birth to her son, IJ,

following which petitioner filed a petition seeking termination of respondent's parental rights to IJ at the initial disposition. After hearings held in July and August 2020, the court first concluded that IJ came within its jurisdiction. Then the court found clear and convincing evidence to terminate respondent's parental rights to both DH and IJ, and that a preponderance of the evidence demonstrated that termination of respondent parental rights was in the children's best interests.[1] This appeal followed.

For her first issue on appeal, respondent challenges the trial court's findings that the statutory grounds for termination were established by clear and convincing evidence. We find no error in this regard. To terminate parental rights, a trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent's parental rights to DH under MCL 712A.19b(3)(c)(*i*), (g), and (j), and terminated her parental rights to IJ under MCL 712A.19b(3)(b)(*i*), (g), (j), and (k)(*iii*). These statutory provisions permit termination under the following circumstances:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

---

[1] The hearing was actually a combined adjudication trial regarding jurisdiction over IJ, and a statutory grounds and best-interest hearing related to both children. The trial court recognized that in *In re Mota*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 351830), this Court held that "[t]he language of MCR 3.977(E) clearly envisions or contemplates two separate proceedings—a trial or plea relative to adjudication *and* a disposition hearing for purposes of termination." *Id.* at ___; slip op at 7. However, the court concluded that, given the constraints related to the COVID-19 pandemic, difficulty securing in-person witnesses, and the overall safety of participants, the court would hold a combined proceeding. We note that the trial court and parties were particularly conscientious regarding what testimony could be considered for purposes of the separate phases of the proceedings. Regarding IJ, for which the court was considering an original petition seeking termination at the initial disposition, it is clear from the record that the court adjudicated respondent and found statutory grounds for termination on the basis of legally admissible evidence. The record indicates that any hearsay that was admitted was identified and considered by the court for best-interest purposes only. During the hearing, the court and parties made it clear they understood that certain evidence was being offered for best-interest purposes only and that they understood the significance of hearsay during the combined proceedings. Further, when certain witnesses were called out of order for best-interest purposes only, this was made clear before any testimony was elicited. Considering the circumstances, we do not criticize the manner in which the trial court proceeded.

(*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

(k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:

* * *

(*iii*) Battering, torture, or other severe physical abuse.

After reviewing the record, we conclude that the trial court did not err when it terminated respondent's parental rights under these grounds.

The trial court took jurisdiction of DH because of respondent's physical abuse, alcohol use, and mental health concerns. Early on, respondent pleaded no contest to the allegations in the petition and no contest to criminal charges of third-degree child abuse. Then, at the January 26, 2021 hearing reopening proofs, respondent conceded for purposes of MCL 712A.19b(3)(b)(*i*) that she physically abused DH. Clear and convincing evidence established that in October 2018, after visiting relatives and consuming large quantities of alcohol, respondent engaged in a physical altercation with another patron at a local store. DH, then almost nine years old, witnessed the patron pepper spray respondent. Later that day, respondent and DH returned to the family home, where respondent physically assaulted DH. Respondent picked DH up by his shirt, threw him to the ground, kicked him repeatedly, and then dragged him across the floor and pushed him into a

closet. DH sustained contusions to his face and head and scratches to his back. A dental cap covering a root canal also became dislodged and DH was required to undergo further dental treatment. This evidence was sufficient to show that there was abuse, and it was severe. "Severe physical abuse" is not defined in MCL 712A.19b(3)(k)(*iii*), but " '[c]hild abuse' means harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy." MCL 722.622(g). "Severe" is commonly defined, in relevant part, as "very painful or harmful." *Merriam–Webster's Collegiate Dictionary* (11th ed.)

After the court took temporary custody of DH, it ordered respondent to comply with a treatment plan designed to assist her in overcoming the issues that brought her child into care. Respondent was required to participate in services including a psychological evaluation, parenting classes, individual counseling, family counseling when recommended, parenting time, and substance abuse screening. Respondent was also ordered to obtain and maintain suitable housing and a legal source of income.

Respondent was provided a multitude of services designed to improve her parenting skills and address her anger management issues. She did not substantially comply with the treatment plan. To the extent that she participated in services, she did not benefit from them. In particular, at the time of termination, after approximately two years of services, respondent was unable to demonstrate that she could manage her anger and safely parent her children.

Although respondent partially complied with her treatment plan by maintaining suitable housing and a legal source of income, and she consistently tested negative for substances, she never fully participated in and benefited from services designed to address the most significant barrier to reunification; namely, her anger management issues. Early on, because respondent did not execute a release, DHHS could not assess her compliance with mental health treatment. In May 2019, the court ordered respondent to sign a release for her therapy records. Respondent still had not executed the release by the August 8, 2019 review hearing. When respondent finally executed a release and the reports were available, the caseworker learned that despite respondent's representation that she was attending weekly therapy, she clearly was not. By October 10, 2019, respondent had only attended five appointments; one was simply an intake appointment and two appointments were only 20 minutes long. Respondent then missed therapy for several months when she was incarcerated for 77 days in November and December 2019 for a probation violation.

When respondent finally made some effort to comply with the mental health aspect of her treatment plan, her actions impeded any progress. Respondent did not fully disclose to the providers the extent of the abuse that led to her child's removal. Indeed, during the intake process, respondent minimized the nature of the abuse. She asserted that the lack of candor during the intake procedure was irrelevant, and what was more important were the representations she made to her individual therapist. However, a review of the testimony from the therapist reveals that respondent was not candid with this individual either. Respondent did not disclose the extent of the abuse, the fact that DH had sustained injuries that required medical treatment, or the fact that the abuse had occurred more than once. Further, at least two witnesses testified that respondent was combative and verbally aggressive with them. Contrary to respondent's arguments on appeal, the evidence showed that she did not meaningfully engage in the mental health services offered.

-4-

At the July 2020 termination hearing, respondent's treating therapist testified that respondent's anger management issues had not been resolved and respondent would benefit from continued therapy. DH's caregiver, the paternal grandmother, described respondent as a "hothead." Even respondent acknowledge that she needed to make more progress. The evidence was clear and convincing that at the time of termination, respondent had not adequately addressed her anger management issues. This conclusion is supported by an audio recording of respondent's visit with her son in November 2020, just a few months before the court terminated her parental rights. During this visit, respondent accused DH of lying, game-playing, betrayal, and smearing her good name. The trial court accurately recognized that respondent's words evidenced her unresolved anger issues and, at that particular visit, her anger was again directed at DH.

There was also clear and convincing evidence to support the trial court's finding that respondent did not benefit from services designed to improve her parenting skills. An integral part of parenting is recognizing and protecting a child from known risks of harm. At the time the court terminated respondent's parental rights, there was no evidence that she would provide a safe and secure home for her children. Respondent clearly created and tolerated a violent environment. After DH was removed from her care, respondent continued to have multiple relationships with inappropriate men. Respondent contacted the police twice in September and October 2019, reporting instances of domestic violence. On one occasion, respondent sustained visible physical injuries. When the sheriff's department attempted to investigate the complaints, respondent did not cooperate and, in fact, misled the investigators regarding the identity of the perpetrator. In addition to these events, respondent was physically abused by another man, but overlooked the abuse because he was willing to pay to have dental work done to repair damage caused by the assault. This evidence suggests that should the children be returned to respondent's care, it is unlikely that she would identify known risks of harm and act accordingly to protect her children from those risks.

Another example of respondent's poor judgment and questionable parenting skills occurred after the onset of the COVID-19 pandemic. Respondent exhibited two symptoms commonly associated with the virus and was advised not to attend parenting time with her infant son, IJ, until she was tested. Nonetheless, respondent appeared at the caregiver's house for a scheduled visit. Again, respondent failed to recognize a known risk of harm and act in a manner to insure her child's safety.

Respondent's conduct during the November 2020 visit with DH also demonstrated that she was unwilling to put her child's needs ahead of her own. In the audio recording of this visit, respondent could be heard informing DH that his father was not there for him and reminding him that she had been the only one providing for his needs. Several times, respondent accused DH of betraying her, lying to the caseworkers, and "playing a role." Respondent's words caused DH to become quite distraught. This was not the only time that respondent's conduct was emotionally abusive to her child. Respondent admitted that when DH was first removed, she did not give him some of his requested things from the house because she was mad and bitter. Respondent's concerning behavior toward her oldest child indicated that she had not benefited from services.

Clear and convincing evidence also supports a finding that respondent would not be able to address her anger issues and poor parenting skills within a reasonable time. Respondent was provided with services for two years, but demonstrated little progress. Although respondent

claimed that she had taken responsibility for her actions, her conduct at the November 2020 parenting-time visit demonstrated otherwise. Respondent continues to blame the caseworker, DH's alleged lying and manipulation, and the therapist for her lack of progress. Moreover, respondent consistently minimized the extent of her abuse. The evidence clearly demonstrated that respondent did not simply discipline her child for a transgression or mete out punishment commiserate with the infraction, but instead flew into an uncontrollable rage. Ignoring this fact, respondent consistently represented to others that her child was removed from her care because of a "spanking" or a "whooping." Indeed, as late as May 2020, respondent reported that DH's injuries were caused by a dog attack. At the August 2020 termination hearing, respondent testified that she "never did anything to hurt DHs until that time when I had spanked him." Respondent's minimization of the abuse and failure to take responsibility for her actions has clearly impeded any meaningful progress.

Respondent's inability to address her anger management issues and improve her parenting skills, coupled with her history of severely abusing one child, clearly supports the trial court's finding that both children would be at risk of harm and abuse in the future. Respondent had unresolved anger issues with DH. This was evident by statements she made during the November 2020 parenting-time visit. While respondent had not expressed any anger toward IJ because he was never in her care unsupervised, the record supports a finding that the infant would be at similar risk of harm in respondent's care. It is axiomatic that "[h]ow a parent treats one child is certainly probative of how that parent may treat other children." *In re AH*, 245 Mich App 77, 84; 627 NW2d 33 (2001) (quotation marks and citation omitted).

Respondent contends that many of the issues would have been resolved had she been given the opportunity to participate in family therapy. However, family therapy was ordered, but delayed, because of respondent's conduct. In February 2019, DH's therapist indicated that the child was not ready to participate in family therapy with respondent because he was still in the process of building a trusting report with his individual therapist. In May 2019, DH's therapist was still reluctant to start family therapy because of concerns with respondent's emotional behavior. The therapist wanted to meet with respondent individually to discuss DH's needs. Respondent failed to cooperate with these meetings. Respondent was combative and verbally aggressive with the therapist. Toward the end of 2019, respondent was generally participating in meetings with DH's therapist, so family therapy was scheduled to begin in October or November 2019. However, respondent did not show for the scheduled family therapy session in October 2019 because she was incarcerated. DH had been brought for the session and stated that he expected that she would not be present. After this no-show by respondent, DH's therapist had a difficult time getting DH to talk about respondent. DH was unwilling to participate in another family therapy session. Respondent fails to recognize that her behavior was the major impediment to her and DH participating in family therapy.

In sum, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights to DH pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j), and to terminate her parental rights to IJ under MCL 712A.19b(3)(b)(*i*), (g), (j), and (k)(*iii*). At the time the court terminated respondent's parental rights, DH had been in care for approximately two years. During this time, respondent was offered a multitude of services designed to address the barriers to reunification. Although respondent partially complied with her treatment plan, it was clear that she did not comply with the most critical components of her treatment plan. To the

extent that she did comply, she clearly did not benefit from the services offered. Not only must a respondent cooperate in services, she must benefit therefrom. *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). Anger management, one of the primary conditions that led to adjudication, continued to exist and there was no evidence that respondent was reasonably likely to resolve this issue within a reasonable time. As a result, respondent could not demonstrate that she was in a position to safely and properly parent her children. Moreover, the unresolved issues would create a risk of harm to the children if they were placed in respondent's care. Accordingly, the trial court did not clearly err when it found that the statutory grounds for termination had been established by clear and convincing evidence.

Respondent argues, in passing, that the trial court erred when it reopened proofs to allow testimony to be taken regarding MCL 712A.19b(3)(b)(*i*) and (k)(*iii*). However, respondent misconstrues the proceedings. On December 8, 2020, DHHS filed a motion seeking to amend the petition to conform the pleadings to the proofs that were introduced during the hearing.[2] In this motion, DHHS explained that in the May 26, 2020 original petition relative to IJ, petitioner sought termination of respondent's parental rights pursuant to MCL 712A.19b(3)(b)(*i*), (g), (j), and (k)(*iii*), but two subsequently filed amended petitions omitted MCL 712A.19b(3)(b)(*i*) and (k)(*iii*) as grounds for termination. By its motion, petitioner sought leave to amend the petitions to include the omitted statutory grounds. Petitioner asserted that respondent would not be prejudiced because she was on notice of these grounds throughout the termination hearing and, without objection, petitioner referenced these grounds in its closing argument, and respondent had an opportunity to respond during her closing argument. In addition, respondent was on notice that the grounds had not been abandoned in light of the fact that the amended petitions continued to include allegations detailing the serious physical abuse.

The trial court agreed that these grounds were raised and argued during the hearing and that respondent had an opportunity to respond. Therefore, over respondent's objections, the court granted petitioner's motion. However, to avoid any possible prejudice to respondent, the court offered respondent an opportunity to reopen the proofs to present additional evidence, and respondent accepted this offer. Under the circumstances, the trial court did not err. A petition may be amended at any time, as the ends of justice require. MCL 712A.11(b). In this case, the court simply allowed the pleading to be amended to conform to the proofs. Further, the proofs were reopened at respondent's request. A "[r]espondent may not assign as error on appeal something that she deemed proper in the lower court because allowing her to do so would permit respondent to harbor error as an appellate parachute." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). Accordingly, we reject this claim of error.

Next, respondent challenges the trial court's findings that termination of her parental rights was in the children's best interests. We find no error in this regard.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be

---

[2] Although petitioner's motion was entitled a petition to "reopen proofs," petitioner made it clear that the motion was not to reopen proofs, but rather to conform the pleadings to the proofs.

made." MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The court should weigh all the evidence available to determine the child's best interests. *Id.* A trial court must consider the best interests of each child individually, *In re Olive/Metts*, 297 Mich App at 42, but is only required to make explicit "factual findings concerning each child's best interests" when "the best interests of the individual children significantly differ," *In re White*, 303 Mich App at 715-716. Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding whether termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

In this case, the trial court provided a detailed analysis of each child's best interests, it considered all of the appropriate evidence, and it weighed a variety of factors. Because the children's interests significantly differed, the court explicitly addressed the best interests of each child individually.

DH was 11 years old at the time of termination. He had been in care for approximately two years. Respondent's inability to achieve the progress necessary to warrant reunification was taking its toll on DH. His caseworker explained that DH was frustrated and crying out for permanence. Unfortunately, respondent could not meet DH's needs. During the time that DH was in care, respondent was offered services, but failed to benefit from them. As a consequence, respondent had not addressed her anger issues and DH would be at risk of harm in respondent's care. Termination of respondent's parental rights was the only avenue by which DH could attain the safety, permanence, stability, and finality he desperately required.

Respondent asserts that a bond existed between her and DH. There was some testimony that DH appeared to enjoy parenting time with respondent and, on occasion, he requested that the visits be extended. However, there was also evidence that DH was deeply scarred by respondent's abuse, that he was afraid of her, and that he preferred to live with his father. DH also expressed an intent to run away, physically harm himself, or physically harm respondent should he be returned to respondent's care. Thus, the bond between respondent and DH was tenuous at best. Under the circumstances, any bond was not a factor that weighed in favor of preserving respondent's parental rights.

At the time of the termination hearing, DH was in the care of his paternal grandmother. This grandparent had expressed a willingness to plan long-term for DH's care. Although placement with a relative weighs against termination, and the fact that a child is living with a relative must be considered, a trial court may terminate parental rights in lieu of placement with a relative if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. In this case, the trial court acknowledged the relative placement, but still found that termination of respondent's parental rights was in the DH's best interests. It noted that DH would

not be safe in respondent's care and that placement with the paternal grandmother was safe and stable. Considering this, the trial court did not clearly err when it found that termination of respondent's parental rights was in DH's best interests, despite that he was in relative placement with his paternal grandmother.

A preponderance of the evidence also supports the trial court's finding that termination of respondent's parental rights was in IJ's best interests. It was undisputed that a bond existed between respondent and IJ. Respondent visited IJ nearly every day and when she did so, she provided for all of his needs. However, there was no indication that respondent could safely parent IJ if the child was returned to respondent's care. Indeed, IJ would be at risk of harm in respondent's care. Respondent had a history of severely physically abusing IJ's half-sibling. Respondent was offered services, but failed to fully participate in and benefit from them. Anger management continued to be a critical issue in this case. Respondent exhibited unresolved anger issues and she was involved in instances of domestic violence dating back to when she was pregnant with IJ. Although a bond existed with the very young IJ, the trial court could reasonably find that his safety and security was paramount and superseded that bond.

As with DH, the court specifically considered the fact that IJ was placed with a relative. Indeed, IJ, 10 months old at the time of termination, had been with his maternal cousin since birth. Placement with this individual was the only home IJ had ever known. The trial court noted that IJ was placed with a relative and that it was required to explicitly consider this factor. As the trial court concluded, although IJ's placement with his maternal cousin weighed against termination, there were other more compelling reasons supporting termination of respondent's parental rights. Specifically, IJ was doing well in his relative placement, but he would be at risk of harm in respondent's care. The court also recognized that IJ was likely adoptable because of his young age. Accordingly, the trial court did not clearly err in finding that termination of respondent's parental rights was in IJ's best interests.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola