*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re BELL/GINYARD, Minors.

UNPUBLISHED
January 20, 2022

No. 356781
Wayne Circuit Court
Family Division
LC No. 2007-472995-NA

In re S. F. D. BELL, Minor.

No. 356782
Wayne Circuit Court
Family Division
LC No. 2007-472995-NA

In re T. M. GINYARD, Minor.

No. 356794
Wayne Circuit Court
Family Division
LC No. 2007-472995-NA

Before: GADOLA, P.J., and MARKEY and MURRAY, JJ.

PER CURIAM.

In these consolidated appeals, respondent-mother A. Clay, and respondent-fathers, P. Bell and D. Ginyard, each appeal as of right the termination of their parental rights to two children, TMG and SFDB. In Docket No. 356781, Clay appeals the termination of her parental rights to TMG and SFDB. The court terminated Clay's parental rights to TMG pursuant to MCL 712A.19b(3)(g), (i) and (j), and terminated her parental rights to SFDB pursuant to those same grounds and also under MCL 712A.19b(3)(c)(*i*) and (c)(*ii*). In Docket No. 356782, Bell appeals the termination of his parental rights to SFDB pursuant to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). Lastly, in Docket No. 356794, Ginyard appeals the termination of his parental right to TMG pursuant to MCL 712A.19b(3)(a)(*ii*), (g), and (j). Finding no errors warranting reversal, we affirm in each appeal.

-1-

# I. STATUTORY GROUNDS

All three respondents argue that the trial court erred when it found statutory grounds to terminate their parental rights. To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

When terminating the parental rights of the three respondents, the trial court relied on one or more of the following provisions of MCL 712A.19b(3):

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> (a) The child has been deserted under either of the following circumstances:
>
> * * *
>
> (*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *

(i) Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and the parent has failed to rectify the conditions that led to the prior termination of parental rights.

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

After reviewing the extensive record, and considering each respondent and his or her circumstances individually, we conclude that the trial court did not clearly err when it found that the statutory grounds for termination of respondents' parental rights were established by clear and convincing evidence.

## A. RESPONDENT CLAY

The trial court terminated Clay's parental rights to TMG and SFDB under MCL 712A.19b(3) (g), (i), and (j). The court also relied on MCL 712A.19b(3)(c)(*i*) and (*ii*) to terminate Clay's parental rights to SFDB. Clay's extensive history with Child Protective Services (CPS) and the court system, and her inability to benefit from the multitude of services offered demonstrates that the trial court did not clearly err when it relied on the foregoing grounds to terminate Clay's parental rights to her two youngest children.

In addition to SFDB and TMG, 36-year-old Clay has given birth to three other children: AMC, EC, and AC. Clay's CPS history dates back to 2007, when her two oldest children, AMC and EC, were removed from her care. The court took jurisdiction of these children and, in 2008, Clay was offered a treatment plan designed to address her mental instability, substance abuse, and poor parenting skills. While these two children were wards of the court, Clay gave birth to a third child, AC, who was similarly removed from the home. Clay was granted additional time to work toward reunification. After approximately three years of services, petitioner sought termination of Clay's parental rights. A termination hearing began, but a mistrial was declared because of procedural irregularities. Petitioner refiled the petition and a hearing on that petition was scheduled, but before its commencement, Clay agreed to release her parental rights to AMC and AC. The third child, EC, was placed in a juvenile guardianship with the maternal grandmother, Z. Hicks.

Approximately two years later, in 2015, Clay gave birth to Ginyard's daughter, TMG, one of the children at issue in this appeal. Shortly thereafter, petitioner filed a permanent-custody petition. Clay entered a plea in which she admitted, among other things, the earlier termination of her parental rights, a 12-year history of mental health issues, and substance abuse. The court found that statutory grounds existed to terminate Clay's parental rights to TMG, but it declined to do so after concluding that termination would not be in the child's best interests. Instead, the court again ordered services and granted Clay more time to remove the barriers to reunification. Approximately six months later, although Clay was not in compliance with her treatment plan, the court placed TMG in Ginyard's custody and terminated its jurisdiction.

More recently, in August 2019, Clay gave birth to her youngest child, SFDB, who tested positive for THC at the time of her birth. Again, a permanent-custody petition was filed. In

November 2019, the court once again found grounds to terminate Clay's parental rights, but declined to do so. Instead, Clay was provided, for the third time, with an extensive treatment plan. Similar to the earlier cases, Clay was offered services including individual therapy, a psychological evaluation, parenting classes, parenting time, a substance abuse assessment and screening, and housing assistance. During the months that followed, Clay did not make any meaningful progress with her treatment plan. To the extent that she did participate in services, she did not benefit from them.

Clay's mental health issues were the most significant barriers to reunification. Indeed, she has struggled to achieve emotional and mental stability for years. The caseworker assigned to this family for the year preceding the March 2021 termination hearing testified that she made multiple referrals for individual therapy. Clay was early-terminated from services because of her noncompliance. Nonetheless, re-referrals were made. Despite these efforts, Clay never completed or consistently participated in individual therapy.

Clay's erratic behavior clearly impaired her ability to parent the children and would have placed the children at risk of harm if they were returned to her care. Indeed, during the early morning hours of April 30, 2020, the police found an incoherent Clay wandering the streets with a distraught TMG, who should not have even been in her care. Clay was transported by ambulance to a local hospital, but later transferred to a psychiatric hospital. Clay was found to be delusional and psychotic, and she was diagnosed with schizophrenia. Clay was hospitalized again in early August 2020 for psychiatric treatment. Indeed, Clay was hospitalized at least three times between September 2019 and August 2020.

Clay argues, as she did below, that at the time of termination she was complying with the mental health component of her treatment plan. While there was evidence that she appeared monthly to receive her medication injection, that does not constitute substantial compliance with mental health services. Despite Clay's representations to the contrary, she was not meaningfully participating in her individual therapy. This important treatment would have been a barometer by which to measure and monitor her mental health and emotional stability.

Clay did not comply with several other aspects of her treatment plan. After eight or nine referrals, Clay still had not completed a parenting class. A few weeks before the termination hearing, Clay finally began a parenting education course, but she had not even completed a quarter of the course at the time of termination. It is clear that Clay had learned very little in those three weeks of parenting classes because she could not even demonstrate a commitment to her children by attending the termination hearing. While Clay did attend parenting time, both the in-person and virtual visits offered, and it was reported that these visits were appropriate, this did not demonstrate that she was capable of providing consistent care long-term. This is particularly true considering the reports that when the visits went virtual, Clay requested that the time be reduced. Further, although the virtual visits were scheduled, Clay did not comply with the schedule. Also, Clay was excluded from parenting classes because she could not log in at the appointed time. Clay's inability to adhere to even a minimal schedule did not bode well for a finding that she could consistently meet the needs of two young children, day-in and day-out.

Substance abuse was also an issue in this case, as it was in earlier proceedings. At least two of Clay's children tested positive for THC at birth and, in an earlier case, Clay admitted to

having substance abuse issues. Accordingly, a substance abuse assessment and treatment, if necessary, was an important component of her treatment plan. During the entire time the children were in care, Clay did not submit to even one of the court-ordered drug screens. Consequently, there is no basis for concluding that substance abuse had been removed as a barrier to reunification.

Despite assistance from the caseworker, Clay lacked suitable housing. At the time of the March 2021 termination hearing, Clay was living in a motel. While she admitted as much, she refused to disclose the location to the caseworker, asserting that it was none of the worker's business. Even before Clay moved to the motel, she refused to allow the caseworker to assess the suitability of the home. The caseworker believed that Clay did have a legal source of income as the recipient of SSI benefits. However, the worker was never able to confirm this and Clay, again, informed the worker that any inquiry into her finances was none of the worker's business.

The record supports a finding, by clear and convincing evidence, that to the extent that Clay did participate in services, she did not benefit from them. Despite literally years of assistance, Clay was in no better position to parent SFDB and TMG than when they were removed from her care. Clearly, the conditions that led to the adjudication continued to exist and the children would be at risk of harm in Clay's care.

Further, the record supports the trial court's finding that there was no reasonable likelihood that Clay would be in a position to safely parent her children within a reasonable time. Clay had been offered services for literally years between 2008 and 2021. On more than one occasion, despite grounds for termination, the trial court granted Clay additional time and opportunity to benefit from services. Indeed, between the current case and the prior proceedings, Clay was offered and ordered to comply with three separate treatment plans. Despite this assistance, she was unable achieve emotional stability and demonstrate the ability to parent her children. History continued to repeat itself as the issues present in the current case were virtually identical to those that precipitated the removal of three older children and the eventual termination of her parental rights to two of those children, albeit voluntary, between 2008 and 2013.

After carefully considering the extensive record, we conclude that the trial court did not clearly err when it found clear and convincing evidence to terminate Clay's parental rights to SFDB under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), (i), and (j), and to TMG under MCL 712A.19b(3)(g), (i), and (j).

## B. RESPONDENT BELL

Bell asserts that the trial court erred when it terminated his parental rights to SFDB under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).

Bell was identified as SFDB's putative father. He did not establish paternity until after the petition was filed. SFDB came into care as a consequence of multiple conditions. In addition to Clay's continued drug use, mental instability, and prior CPS history, SFDB was adjudicated a court ward because of Bell's failure to establish paternity and his failure to protect the newborn from Clay's prenatal drug use. At all times pertinent, Bell and Clay indicated that they would be planning together to achieve reunification with SFDB. Early on, it was explained to Bell that

because he was planning with Clay, her failure to achieve stability would impair his ability to reunify with his daughter.

After the court found grounds to assume jurisdiction over SFDB on account of both Clay's and Bell's conduct, the court ordered Bell to comply with a fairly simple treatment plan. Bell was to participate in parenting classes, attend supervised parenting time, and obtain and maintain stable housing and a legal source of income. At the time of termination, Bell had not achieved substantial compliance with any of the elements of the plan.

Similar to Clay, the caseworker provided Bell with eight or nine referrals for parenting classes, yet he never completed a parenting education course. On the eve of the termination hearing in March 2021, Bell finally began parenting classes. It was reported that he had attended the first three classes of a 13-class course. The court concluded that Bell's efforts in this regard were "too little, too late." It was particularly important that Bell attend a parenting class to improve his parenting skills. Because he continued to plan with Clay, and her ability to provide a fit home was in question, Bell would need to acquire the skills necessary to demonstrate that he could independently provide for SFDB's physical needs and also protect his child from Clay's mental instability and her potential drug use. At the time of termination, the evidence supported a finding that Clay was in no better position to parent his child than when SFDB was removed from his care 18 months earlier. Moreover, despite this brief participation in the classes, Bell failed to attend the termination hearing.

Bell also lacked suitable housing. At the time of termination, Bell was staying in his brother's home. He refused to allow the caseworker to assess the home to determine if it was suitable for SFDB. Regarding a legal source of income, Bell claimed that he was employed part time as a security guard and paid "under the table," but he never provided the caseworker with verification of his employment or income.

Other than regularly attending parenting time with Clay, Bell made virtually no effort, independent of Clay or otherwise, to comply with his treatment plain. Accordingly, the record supports the trial court's reliance on MCL 712A.19b(3)(g) and (j) as grounds for terminating his parental rights. "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id*. at 711.

The court did not order Bell to comply with a particularly arduous treatment plan. Indeed, he was asked to do the bare minimum and he was unable to demonstrate even minimal progress. As the caseworker explained, and Bell's efforts demonstrated, Bell clearly was unmotivated to plan for his child. In the worker's estimation, Bell simply did what Clay told him to do; he had not developed any internal or independent drive. Bell never demonstrated a serious commitment to his daughter. Consequently, the caseworker accurately questioned whether it would be beneficial to allow Bell more time to work toward reunification. Considering Bell's wholesale failure to comply with services during the approximately 18 months his daughter was in care, the lack of any evidence that he could properly care for and protect his daughter from known risks of

harm, and his ambivalence, the trial court did not clearly err when it terminated Bell's parental rights to SFDB under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).

## C.  RESPONDENT GINYARD

The trial court terminated Ginyard's parental rights to his daughter TMG pursuant to MCL 712A.19b(3)(a)(*ii*), (g), and (j).  After reviewing the record, we find no error.

In November 2015, amidst allegations that Clay could not care for her daughter because of severe mental health issues, the court entrusted Ginyard with the sole care and custody of TMG. The evidence presented at the time of termination established that Ginyard violated the court's trust.  In the early morning hours of April 30, 2020, TMG was found in Clay's care.  Not only was the child with Clay unsupervised, the two were wandering the streets in the middle of the night and Clay was experiencing a severe mental health crisis.  She was psychotic and delusional.  After these events, TMG was placed with her maternal grandmother.  Petitioner then set about the task of locating Ginyard.  The initial caseworker sent communications to all of Ginyard's known addresses and telephone numbers.  No response was received.  In June 2020, Ginyard contacted the CPS specialist.  At that time, he indicated that he wanted to retrieve his child, but when the specialist made further inquiry, Ginyard hung up the phone.

Petitioner filed the petition seeking termination of Ginyard's parental rights on October 6, 2020.  Petitioner then continued its efforts to contact Ginyard.  The record also indicates that Ginyard was, in fact, receiving petitioner's communication efforts.  After the petition was filed, the caseworker texted Ginyard a Zoom link to make it possible for him to attend the preliminary hearing on October 6, 2020.  Ginyard used this link to attend the Zoom hearing.  The caseworker testified that apparently her previously unanswered communications had actually reached Ginyard because he was aware of and present by Zoom at the hearing.  At this hearing, the court granted Ginyard supervised parenting time with TMG.  At another Zoom hearing on October 13, 2020, the court ordered petitioner to offer Ginyard voluntary services.  Unfortunately, after this, Ginyard failed to contact the agency to plan for his child.  Then, similar to the other respondents, Ginyard failed to attend the March 16, 2021 combined adjudication and statutory-grounds hearing.

Testimony elicited at the March 16, 2021 hearing established that after the April 2020 events involving Clay, Ginyard made little to no effort to contact petitioner or plan for his child's care.  He did not provide any financial support for TMG and there was no evidence that he contacted relatives inquiring about TMG's well-being.

During the hearing, in Ginyard's absence, his attorney suggested that Ginyard was unaware that he could not allow contact between Clay and TMG.  The record refutes this position.  The 2015 court order granting Ginyard care and custody was entered during a child protective proceeding that had been ongoing for nine months and was related to Clay's instability and her inability to care for her child.  Ginyard was eventually deemed a nonrespondent parent in this earlier case.  The actual order granting Ginyard custody referenced Clay's noncompliance with her treatment plan.  Under these circumstances, Ginyard's position that he was unaware that he should not leave TMG in Clay's care is not credible.  At the very least, Ginyard knew, or should have known, that TMG would not be safe in Clay's care and that unsupervised visits would be detrimental to the child's safety.

Based on the foregoing record, the trial court did not clearly err when it found clear and convincing evidence to support termination of Ginyard's parental rights under MCL 712A.19b(3)(a)(*ii*), (g), and (j).

As a final note, in an extremely cursory and perfunctory fashion, Ginyard argues that it was "outrageous" that the trial court terminated his parental rights without granting him visits or a treatment plan. As mentioned earlier, it is misleading to assert that the court did not permit Ginyard to exercise parenting time. Further, the trial court found, and we agree, that under the circumstances of this case, petitioner was not required to exert reasonable efforts toward reunification.

A trial court is not required to make reasonable efforts to reunify a child with a parent if there is a judicial determination that the parent has subjected the child to aggravated circumstances set forth in MCL 722.638(1) and (2). See MCL 712A.19a(2)(a). Relevant to this case, MCL 722.638(1) provides:

> (1) The department shall submit a petition for authorization by the court under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2, if 1 or more of the following apply:

> (a) The department determines that a parent, guardian, or custodian, or a person who is 18 years of age or older and who resides for any length of time in the child's home, has abused the child or a sibling of the child and the abuse included 1 or more of the following:

> (*i*) Abandonment of a young child.

On October 6, 2020, the trial court found that reasonable efforts were not required because, based on the testimony, the department had determined that Ginyard had abandoned TMG.

The testimony at both the October 6, 2020 hearing and at the termination hearing on March 16, 2021 established that Ginyard abandoned his daughter and did not seek custody in any meaningful way. For several weeks after the events of April 30, 2020 involving Clay, Ginyard's whereabout were unknown. He then contacted petitioner in June 2020, but was uncooperative and quickly terminated the phone call he initiated. Months passed and Ginyard made no inquiries into his child's well-being. Then he appeared at a Zoom hearing in October 2020, after the petition was filed and facilitated by a Zoom link texted to him by the caseworker. After that, Ginyard again disappeared. He did not make any effort to contact petitioner, plan for her care, inquire into her well-being, or provide financial support for her care. Indeed, Ginyard did not attend the March 2021 combined adjudication and statutory-grounds hearing. Under these circumstances, applying the plain language MCL 722.638(1) and MCL 712A.19a(2)(a), reasonable efforts were not required. As a final consideration, we note that at the preliminary and pretrial hearings in October 2020, the court granted Ginyard supervised parenting time and voluntary services, but he failed to take advantage of these opportunities and instead chose to abandon his daughter.

## II. BEST INTERESTS

All three respondents challenge the trial court's finding that termination of their parental rights was in the children's best interests. We find no error in this regard.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713. In considering the child's best interests, the trial court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id*. at 90. This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App at 129.

All three respondents make similar arguments regarding the best interests of their children. Clay and Bell assert that they were making progress on their treatment plans, and that a parent-child bond existed. Ginyard argues that petitioner never bothered to ascertain the nature of the bond between him and TMG. All three respondents argued that because the children were placed with their maternal grandmother, termination of their parental rights was not warranted. The trial court weighed all of the factors cited by respondents, particularly the fact that the children were in relative placement, and still concluded that these factors weighed in favor of terminating respondents' parental rights. The trial court did not clearly err.

A preponderance of the evidence established that the children would not be safe in their respective parent's care. Despite Clay's and Bell's assertions to the contrary, they had not substantially complied with their treatment plans. Neither parent had fully participated in or benefited from the services offered. Regarding Clay, her unresolved mental health issues and substance abuse remained barriers to reunification. Neither Clay nor Bell had suitable housing. The evidence further established that Ginyard failed to protect his child from a known risk of harm. He then abandoned his child and made no effort to plan for her care. Considering this record, the children would not be safe in their parents' care.

Although all three respondents cite the existence of a parent-child bond, this bond was not enough to compel their attendance at the termination hearing. In any event, while respondents and their children may have a bond, this factor did not outweigh the children's need for safety and stability. Given their young ages, it was critical that they be placed with someone who could provide adequate care and supervision.

Both SFDB and TMG were placed together, along with other siblings, in the home of their maternal grandmother. A court is required to consider relative placement when contemplating the best interests of a child. It is axiomatic that placement with a relative is a factor that weighs against

termination of parental rights. *In re Olive/Metts*, 297 Mich App at 43. However, even though placement with a relative weighs against termination, and the fact that a child is living with a relative must be considered, a trial court may still terminate parental rights if it finds that termination is in the child's best interests. *Id.* Here, the trial court acknowledged the relative placement, but still found that termination of respondents' parental rights was in the children's best interests. The children were doing well in their relative placement, the maternal grandmother was meeting the children's needs, and she had indicated a desire to plan long term for these two children. The court balanced several factors and then concluded that the children's safety was paramount. Considering this, the trial court did not clearly err when it determined that termination of respondents' parental rights was in the children's best interests, despite the fact they were in a relative placement with their maternal grandmother.

Moreover, SFDB had been in her grandmother's care for approximately 18 months, essentially her entire young life. TMG had now twice been made a ward of the court. Under these circumstances, termination of respondents' parental rights was the best avenue by which the children would be afforded the greatest opportunity to achieve permanence, stability, and finality.

Affirmed.

/s/ Michael F. Gadola
/s/ Jane E. Markey
/s/ Christopher M. Murray

-10-